## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

WILLIAM M. BULGER, JR.
Administrator of the Estate of James Bulger;

     Plaintiff,

v.

JOHN/ JANE DOES 1 - 30
ALL OF WHOM ARE EMPLOYEES
OF THE FEDERAL BUREAU OF PRISONS,

     Defendants.

> ELECTRONICALLY FILED
> 10/30/2020
> U.S. DISTRICT COURT
> Northern District of WV

Civil Action No.: 3:20-CV-206 (Groh/Trumble/Sims)

## **COMPLAINT**

1.    Plaintiff brings this action pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), against the Defendants who include the Warden of USP Hazelton and other additional named and unnamed correctional officer employees of the BOP at United States Penitentiary Hazelton ("USP Hazelton"), where James Bulger, Jr. was subjected to a risk of certain death or serious bodily injury by the intentional or deliberately indifferent actions of the defendants and was thereby caused to endure a violent death at the hands of another inmate within hours of his arrival at the facility.[1]

2.    Plaintiff brings this civil rights action to redress the deprivation under color of state law of rights, privileges and immunities secured to James Bulger, Jr. by provisions of the Eighth Amendment of the United States Constitution.

---

[1] As the statute of limitations for a *Bivens* claim is imminent, this complaint is filed on this date. However, Plaintiff has also filed an administrative claim (commonly referred to as a "Form 95" under the Federal Torts Claim Act, 28 U.S.C. § 2671 *et seq,* which is currently in the administrative claims process, which claim, it is anticipated, will be denied. As that administrative process is not yet complete, FTCA allegations are not yet ripe and if filed as an alternative cause action in within this complaint such allegations would subject to dismissal. Once denied, such claims will likewise be brought.

3.      Plaintiff brings claims for injuries and death arising from the defendants' deliberate indifference to the substantial risk of harm in their failure to protect him from harm and/or prevent the harm.

4.      The defendants knowingly violated James Bulger, Jr.'s civil rights, thus subjected him to pain, physical and mental injury, and death within two years of this civil action, in violation of his rights under the Eighth Amendment of the United States Constitution. Plaintiff further alleges that these acts and/or policies and practices of the defendants and their employees were knowing, deliberate and intentional, in disregard for the health and well-being of James Bulger, Jr. and that such acts, policies and practices are shocking to the conscience of civilized persons and intolerable in a society governed by laws and considerations of due process. Plaintiff seeks compensatory and punitive damages, as well as attorney's fees and costs.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this matter pursuant to U.S.C. §§ 1331 & 1346 (b)(1) as the claims in this case are brought against the individual Defendants under the Eighth Amendment to the United States Constitution, pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

6.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1402(b), as James Bulger, Jr.'s injuries and death occurred in Preston County, West Virginia, which is in the Northern District of West Virginia.

**PARTIES**

Plaintiff

1.      Plaintiff is the administrator of the Estate of James Bulger, Jr., an inmate who was last confined at USP Hazelton, and the brother of James Bulger, Jr. Plaintiff, William Bulger, Jr. qualified in Massachusetts on June 11, 2019, as the administrator of the Estate of James Bulger, Jr. and as his personal representative.

Defendants[2]

2.      John/ Jane Doe 1 was, at all times relevant to this action, the Director of the Federal Bureau of Prisons.  John/Jane Doe 1 was responsible for the entire operations of the Bureau of Prisons and who because of the high profile nature of James Bulger, Jr. was or should have been apprised of the decision making regarding his placement within the Bureau of Prisons and who did or should have made the ultimate decision as to his placement.  John/ Jane Doe 1 is being sued in his or her individual capacity.

3.      John/ Jane Doe 2 was, at all times relevant to this action, the Assistant Director of the Federal Bureau of Prisons and in the absence of the Director or in consultation with the Director or others was responsible for the entire operations of the Bureau of Prisons and who because of the high profile nature of James Bulger, Jr. was or should have been apprised of the decision making regarding his placement within the Bureau of Prisons and who did or should have made the ultimate decision as to his placement. John/ Jane Doe 2 is being sued in his or her individual capacity.

---

[2] At this time, Plaintiff does not know the specific number of John/Jane Doe Defendants involved in the events underlying this action. Plaintiff therefore reserves the right to amend his complaint to identify by name and add or remove Defendants currently identified as "Does" as their roles and identities are revealed through discovery.

4.      John/ Jane Doe 3 was, at all times relevant to this action, the Director of the BOP Southeast Region.  John / Jane Doe 3 was responsible for the entire operations of the Southeast Region    to include FCC Coleman and USP Coleman II and who was or should have been apprised and or consulted regarding the decision making regarding his placement within the Bureau of Prisons and who did or should have made the ultimate decision as to his placement. John/ Jane Doe 3 is being sued in his or her individual capacity.

5.      John/ Jane Doe 4 - was, at all times relevant to this action, the Director of the BOP Mid-Atlantic Region. John / Jane Doe 4 was responsible for the entire operations of the Mid-Atlantic Region to include FCC Hazelton and USP Hazelton and who was or should have been apprised and or consulted regarding the decision making regarding his placement within the Bureau of Prisons and who did or should have made the ultimate decision as to his placement. John/ Jane Doe 4 is being sued in his or her individual capacity.

6.      John/ Jane Doe 5 - Warden of FCC Coleman Complex was, at all times relevant to this action, the Warden of FCC Coleman Complex. John / Jane Doe 5 was responsible for the entire operations of the of FCC Coleman Complex to include USP Coleman II and who was or should have been apprised and or consulted regarding the decision making regarding his placement within the Bureau of Prisons and who did or should have made the ultimate decision as to his placement. John/ Jane Doe 5 is being sued in his or her individual capacity.

7.      John/ Jane Doe 6 - Warden of USP Coleman II was, at all times relevant to this action, the Warden of USP Coleman II. John / Jane Doe 6 was responsible for the entire operations of the USP Coleman II and who was or should have been apprised and or

consulted regarding the decision making regarding his placement within the Bureau of Prisons and who did or should have made the ultimate decision as to his placement. John/ Jane Doe 6 is being sued in his or her individual capacity.

8.      John/ Jane Doe 7 - Warden of FCC Hazelton Complex was, at all times relevant to this action, the Warden of USP Hazelton. John / Jane Doe 7 was responsible for the entire operations of the USP Hazelton and who was or should have been apprised and or consulted regarding the decision making regarding his placement within the Bureau of Prisons and who did or should have made the ultimate decision as to his placement. John/ Jane Doe 7 is being sued in his or her individual capacity.

9.      John/ Jane Doe 8 - Warden of USP Hazelton was, at all times relevant to this action, the Warden of USP Hazelton . John / Jane Doe 8 was responsible for the entire operations of the USP Hazelton and who was or should have been apprised and or consulted regarding the decision making regarding his placement within the Bureau of Prisons and who did or should have made the ultimate decision as to his placement. John/ Jane Doe 8 is being sued in his or her individual capacity.

10.    John/ Jane Doe 9 – Case Manager at USP Coleman II, was, at all times relevant to this action, the Case Manager of USP Coleman II. John / Jane Doe 9 was responsible for compiling, reviewing, and analyzing certain designated reports and computer data relating to James Bulger, Jr. in consultation with other defendants at USP Coleman II in order to properly assess him for placement and/or transfer.

11.    John/ Jane Doe 10 – Unit Manager at USP Coleman II was, at all times relevant to this action, the Unit Manager of USP Coleman II. John / Jane Doe 10 was responsible for compiling, reviewing, and analyzing certain designated reports and computer data

relating to James Bulger, Jr. in consultation with other defendants at USP Coleman II in order to properly assess him for placement and/or transfer.

12.     John/ Jane Doe 11 – Correctional Counselor at USP Coleman II was, at all times relevant to this action, the Correctional Counselor of USP Coleman II. John / Jane Doe 11 was responsible for compiling, reviewing, and analyzing certain designated reports and computer data relating to James Bulger, Jr. in consultation with other defendants at USP Coleman II in order to properly assess him for placement and/or transfer.

13.     John / Jane Doe 12 – Case Manager at USP Hazelton was, at all times relevant to this action, the Case Manager of USP Hazelton. John / Jane Doe 12 was responsible for compiling, reviewing, and analyzing certain designated reports and computer data relating to James Bulger, Jr. in consultation with other defendants at USP Hazelton in order to properly assess him for placement and/or transfer.

14.     John/ Jane Doe 13 – Unit Manager at USP Hazelton was, at all times relevant to this action, the Unit Manager of USP Hazelton. John / Jane Doe 13 was responsible for compiling, reviewing, and analyzing certain designated reports and computer data relating to James Bulger, Jr. in consultation with other defendants at USP Hazelton in order to properly assess him for placement and/or transfer.

15.     John/ Jane Doe 14 – Correctional Counselor at USP Hazleton was, at all times relevant to this action, the Correctional Counselor of USP Hazelton. John / Jane Doe 14 was responsible for compiling, reviewing, and analyzing certain designated reports and computer data relating to James Bulger, Jr. in consultation with other defendants at USP Hazelton in order to properly assess him for placement and/or transfer.

16.     John/ Jane Does 15 – 20 were  at all times relevant to this action, BOP employees at USP Coleman II who had a role and were also responsible for making sure that

process of placement or transfer of James Bulger, Jr. was done properly from USP Coleman II to USP Hazelton in 2018.  John/ Jane Does 15 – 20 are being sued in their individual capacities.

17.     John/ Jane Does 21 – 25 were, at all times relevant to this action, BOP employees at USP Hazelton who had a role and were also responsible for making sure that process of placement or transfer of James Bulger, Jr. was done properly from USP Coleman II to USP Hazelton in 2018.  John/ Jane Does 21 – 25 are being sued in their individual capacities.

18.     John/ Jane Does 26 – 30 who were, at all times relevant to this action, BOP employees at the Designation and Sentence Computation Center (DSCC) of the BOP or at the BOP Central Office located in Washington, D.C.  John/ Jane Does 26 – 30 were responsible for the process of transferring James Bulger, Jr. from USP Coleman II to USP Hazelton in 2018.  John/ Jane Does 26 – 30 are being sued in their individual capacities.

## FACTUAL BACKGROUND

19.     James Bulger, Jr. was perhaps the most infamous and well-known inmate to be incarcerated in a federal penal institution since Al Capone.

20.     James Bulger, Jr.'s reputation and notoriety began well before his June 22, 2011 arrest for indictments in Boston Massachusetts that led to his conviction and incarceration at several federal institutions leading to his killing at USP Hazelton on October 30, 2018.

21.     James Bulger, Jr. has been the subject of over a dozen books written by former criminal colleagues, a State Police Colonel and FBI Agent involved in his prosecution,  a

juror from his 2013 criminal trial, adversaries and other authors with no first-hand knowledge of the person himself.

22.     James Bulger, Jr. has been the inspiration for six widely circulated movies and television shows. A documentary during his trial was produced, presented at the Sundance Film Festival, and shown on Netflix titled "Whitey: United States of America vs. James J. Bulger" (2014).

23.     James Bulger, Jr. has been consistently portrayed as a violent murderous gangster, killer of not only men but also women, and allegedly responsible for at least nineteen murders.  James Bulger, Jr. has been consistently and incessantly falsely portrayed by newspapers, books, court proceedings in over a half-dozen civil trials, documentaries, movies, and other media as an FBI informant and a fierce adversary of law enforcement who flaunted their ineffectiveness.

24.     James Bulger, Jr.'s reputation as a street wise petty criminal earned him the moniker "Whitey." James Bulger, Jr. was well known in South Boston in his early years. His criminal reputation was elevated in 1956 and he pled guilty to bank robbery and was sentenced to a 20 year prison term at the Atlanta Penitentiary. While in the Atlanta Penitentiary records show that James Bulger, Jr. was unwittingly subjected to the MK-ULTRA program. His unknowing participation in this CIA run mind-altering experiment is a much discussed event increasing James Bulger, Jr.'s reputation in the criminal and public arena.

25.     It is well-known that James Bulger, Jr. warred with various criminal factions as he rose in the criminal world. Many books and articles have been written about his warring with neighboring Irish factions in South Boston to his entry into the Winter Hill

Gang. A prominent gang in Boston, the Winter Hill Gang, was comprised of a series of alleged killers reportedly responsible for over 75 murders.

26.     From 1965 to 1995, James Bulger, Jr. has been publicly portrayed as rising through the ranks of the Winter Hill Gang, to become the leader of the Gang leaving at least 19 murder victims in his wake, in addition to engaging in drug dealing, extortion, bookmaking, trafficking weapons with the IRA thorough a ship called the Valhalla.

27.     In 1994 federal prosecutors obtained indictments against James Bulger, Jr. and many of his associates for racketeering and other charges, including multiple murders. James Bulger, Jr. left Boston in December 1994 and was not seen again in South Boston until his arrest in 2011.

28.     During the criminal litigation of James Bulger, Jr.'s co-defendants, one of his co-defendants and former partners, Steven Flemmi, informed the Court that he was a top-echelon informant working with a number of FBI agents including John Connolly and John Morris. Flemmi also accused James Bulger, Jr. of being a top-echelon informant.

29.     Years of litigation widely covered by local and national press led to numerous deals between prosecuting authorities and James Bulger, Jr.'s associates, involving lenient sentences for murders in an effort to garner factual support to prosecute and convict FBI Agent John Connolly and promote the narrative that James Bulger, Jr. was a high-level FBI informant who told on friends, associates, and his competition in the Italian mafia.

30.     This often repeated narrative was advantageous to his murderous associates who used the "snitch" moniker to justify their cooperation with the federal government and avoid their own earned reputation as "rats" or "snitches".  It was advantageous to the prosecutors to help justify the incomprehensible deals with criminals and obtain the

conviction of their target, John Connolly.  It was beneficial to John Connolly to justify his illicit and criminal relationship with James Bulger, Jr.  It was also beneficial to the press who embraced the scandalous label to sell newspapers, to write books, and to profit as self-proclaimed "experts" on James Bulger, Jr.

31.     In James Bulger, Jr.'s absence and without retort, James Bulger, Jr.'s role as an FBI informant was embedded in the criminal community, the legal community and American history. Virtually every description, account, promotion and depiction over the next twenty years led with the supposition that James Bulger, Jr. was an informant and that he took down the Boston Mafia.

32.     As a result of the numerous litigations in Boston, Congress held extensive hearings.  In 2003-2004 Congress issued H. Rept. 108-414 - Everything Secret Degenerates: The FBI's Use Of Murderers As Informants, which embarrassed and enraged the FBI.

33.     James Bulger, Jr. was a fugitive for nearly sixteen years. During that time, he rose to number 2 on the FBI most wanted list with a reward reaching two million dollars. The manhunt and his reputation extended worldwide including London, Normandy, and Uruguay. He reportedly was featured on the television show America's Most Wanted sixteen times, and countless news magazines and news shows. He was repeatedly described as a murderer, killer of women, and an FBI informant. He was portrayed as being despised by the criminal underworld and law enforcement alike. He was arrested on June 22, 2011 in Santa Monica, California, brought to Boston, and put on trial.

34.     Much of the highly publicized federal trial was focused on two competing narratives: the government's attempt to paint James Bulger, Jr. as an informant("snitch") and the enemy of the Boston Mafia, contrasted by the defense's

attempt to dispel decades of unconfronted accusations by the government and prove

that James Bulger, Jr. never provided any information to the government; rather, he

paid enormous sums of money for information.

35.     For example, for days during the trial, the government presented testimony from

law enforcement witnesses all claiming James Bulger, Jr. "snitched on" key mafia

figures.

36.     By way of example, this testimony included claims that James Bulger, Jr. gave the

government information about Frank Salemme, the one-time leader of the New England

Mafia, the boss of the Gambino Crime Family, and Raymond Patriarca the longtime

boss of the Patriarca crime family

37.     This trial tactic insured that James Bulger, Jr., likely to be incarcerated within the

Federal Bureau of Prisons (BOP), would face violence at the hands any number of

deadly criminals, their countless associates, and/or any inmate that might want to make

a name for himself inside the BOP.

38.     In addition to repeated claims that James Bulger, Jr. was a government

informant or "snitch," all reported in the media, an additional deadly label was put on

James Bulger, Jr.

39.     During the cross-examination of cooperating witness Stephen Flemmi, Flemmi

was questioned about sexually violating his teenage step-daughter. Although Flemmi

admitted these transgressions, he made unsupported accusations against James Bulger,

Jr. which grabbed many of the headlines.

40.     "You want to talk about pedophilia - right over there at that table," Flemmi said,

*inter alia.*

41.     The media picked up the accusation and WCVB 5's headline read "Ex-Bulger partner faces more cross-examination - Flemmi accuses Bulger of being pedophile."

42.     The Boston Herald followed with the headline "Flemmi: Bulger was a pedophile"

43.     Consequently, in addition to being labeled the world over as a "snitch", James Bulger, Jr. was being portrayed as a pedophile as well.

44.     It is well known by law enforcement, prosecutors, and correctional officers that there are two labels you never, ever want to have if you are an inmate: informant (in prison parlance "snitch") or pedophile "child molester" (in prison parlance "chomo".)

45.     It is well known by law enforcement, prosecutors, and correctional officers that an inmate who is labeled either a "snitch" or a "chomo" is particularly at risk and such a label can be a death sentence at the hands of inmates who are duty bound in prison culture to attack either "snitches" or "chomos" on sight.

46.     It is also well known by law enforcement, prosecutors, and correctional officers that any inmate who exhibits any common decency or friendliness toward someone labeled as a "snitch" or a "chomo" is tainted and that inmate is subject to being attacked. This is because it is assumed in prison culture that if you "put up with" that type of behavior you, too, must be a "snitch" or a "chomo".

47.     Carrying the label of both "snitch" and "chomo" and having such allegations so publicized put James Bulger, Jr. at extremely high risk of serious injury or death at the hands of inmates.

48.     As expected, on November 14, 2013, James Bulger, Jr. was convicted of various counts of racketeering, conspiracy, and a number of predicate offenses such as extortion, money laundering, and firearm offenses, along with 11 murders.

49.     James Bulger, Jr.'s sentence was two consecutive life sentences plus five years.

50.     James Bulger, Jr., a notorious South Boston mobster who served as the inspiration for several books and Hollywood films, was among the most high-profile of federal prisoners in the history of the BOP.  His reputation as a mob turncoat and killer of women, essentially confirmed by the jury's verdict it was certain he would have had no shortage of enemies within the BOP.

## PLYMOUTH HOUSE OF CORRECTION

51.     Soon after his arrest, as a pre-trial defendant without bond, James Bulger, Jr. was housed at the Plymouth County House of Correction from 2011 until he was transferred to the Metropolitan Detention Center ("MDC") in Brooklyn, N.Y. in 2013.

52.     James Bulger, Jr. was assigned to a cell in a segregated housing unit in a condition of *de facto* "solitary confinement" for his protection from other inmates.

53.     James Bulger, Jr. lived in this condition of solitary confinement for nearly two years.

54.     While solitary confinement did separate James Bulger, Jr.  from other inmates who may have wished to do harm to him  it also gave largely unobserved access by correctional officers who had the opportunity to and did harass James Bulger, Jr. because of his notoriety and the informal and formal allegations against him.

55.     What contact he had with other human beings, was often verbally and/or physically abusive toward him.

56.     James Bulger, Jr. was strip-searched on a daily basis, reportedly many times per day. On many days, James Bulger, Jr. was strip-searched more than five times per day.

57.     In addition to the solitary confinement and repeated strip searches, a guard was placed at the door of James Bulger, Jr.'s cell on a 24-hour basis, seven days per week.

Each 8-hour shift, a guard was assigned to sit on a stool and keep constant visual contact with James Bulger, Jr.. The posted guard was also instructed to keep in radio contact at all times

58.     This treatment of James Bulger, Jr. while at Plymouth is evidence of either well-founded caution to protect the well-being of James Bulger, Jr. from harm perpetrated by other inmates based upon his well-known, infamous notoriety or served no penological purpose and was unnecessary, abusive, and sadistic and is evidence of law enforcement personnel's feelings of anger, hate and general opprobrium and the their willingness to act upon those feelings by seeking to harm James Bulger, Jr..

59.     By the end of his stay at Plymouth, James Bulger, Jr. and had deteriorated medically and mentally and was suffering from heart problems, other medical problems, and was confined to a wheelchair.

### USP TUCSON

60.     Sometime after James Bulger, Jr.'s judgment and commitment order and other documents had been reviewed by the BOP, the  Designation and Sentence Computation Center (DSCC), computed his sentence and decisions were made as to what BOP would be his home. That process and decision-making placed him at USP Tucson.

61.     USP Tucson is known colloquially within the BOP as a "soft yard" which means that despite being a USP (the highest level of severity and security to the public save ADX or ADMAX) it was developed as a place for inmates with long sentences to serve who were in need of protection from other inmates  because of a substantial risk of harm and who need protected due to  the nature of their crimes or other reasons.

62.     Many inmates with child sex offenses are designated to serve sentences at USP Tucson.

63.    Despite the fact that James Bulger, Jr.'s was assigned to a "soft yard" while housed in general population James Bulger, Jr. another inmate was able to access James Bulger, Jr.'s unlocked cell and stabbed him in the head while he lay there sleeping.

64.    Upon information and belief, the inmate who attacked James Bulger, Jr. was motivated by the fact that his deed would be celebrated by certain inmates and guards alike and he would achieve status or "street cred"  for attacking such an infamous criminal figure.

65.    During his time at Tucson James Bulger, Jr. spent time in the Special Housing Unit (SHU) the place in BOP facilities where inmates are isolated from other inmates for their protection or because they are being punished or because they pose a physical threat to other inmates.

66.    While he was incarcerated in the SHU, James Bulger, Jr.'s mental and physical health deteriorated. James Bulger, Jr. was not able to walk or stand unaided and was falling on a frequent basis and he was consigned to the use of a wheelchair for the duration of his incarceration at USP Tucson.

**USP COLEMAN II**

67.    In September 2014, James Bulger, Jr. was transferred to USP Coleman II in Sumterville, Florida.

68.    Like USP Tuscon, USP Coleman II is known colloquially within the BOP as a "soft yard" as described above.

69.    USP Coleman II is known to house inmates who have disputes with gangs which put them at a substantial risk of harm and who need protected due to "gang politics," the nature of their crimes or other reasons.

70.     While at USP Coleman II, James Bulger, Jr. continued to have medical issues and suffered from a pre-existing heart condition, complained of pain, and sought medical help for acute symptoms of heart attack.

71.     While at USP Coleman II, James Bulger, Jr. had various disputes with staff regarding treatment for his medical conditions. Elements of those disputes were leaked to the press which further and unfairly labeled him as not only a troublemaker but a sexual deviant.

**USP Hazelton**

72.     USP Hazelton is a particularly violent place, where inmate on inmate violence runs rampant and has for many years. It is colloquially known as "Misery Mountain."

73.     Weapons possession and assaults with weapons are so frequent they are almost routine.

74.     Inmates at Hazelton have reported that  correctional staff inform new inmates upon arrival  that to survive at Hazelton they should not get into debt to other inmates, never assault a guard, and to be sure to arm themselves with a shiv (homemade knife). One warden is reported to even hold up a homemade knife as an illustration at an orientation meeting with inmates.

75.     The most common weapons utilized by inmates  are shivs because of their potential for lethality and bolo-type weapons easily made by two non- prohibited items: a lock and sock or series of socks tied together or a lock secured at the end of a belt.

76.     The level of violence was so high at Hazelton that in 2014, the American Federation of Government Employees Local 420 posted billboards located between Exit 29 and the Maryland state line (in each direction) stating "2014 alone — 150 assaults + 2 murders. Hazelton Prison is unsafe for the community, inmates and staff."

77.     The level of violence and weapons possession at Hazelton was so high that the court in the Northern District of West Virginia, at one point, created a fast track system to handle the numerous cases. That system combined a plea and sentencing hearing to facilitate the identification, prosecution, and sentencing of inmates for weapons' possession in particular.

78.     The level of violence at Hazelton in recent years has produced over a dozen serious assaults with permanent life-threatening injuries and/or death.

79.     The Department of Justice has identified various inmate on inmate homicides as death penalty -eligible, resulting and at least two inmates who are under indictment and currently authorized for death penalty consideration.

80.     It has been openly admitted by USP Hazelton correctional officials that the institution is a is a "gang run" yard.

81.     USP Hazelton is recognized as a volatile place where officers are trained to maintain officer safety and not to intervene when there is inmate on inmate violence unless there is sufficient number of officers available.

82.     USP Hazelton is continually understaffed so a "sufficient number of officers" are often not readily available and therefore inmates are left to fend for themselves if attacked.

83.     The level of violence at USP Hazelton has been and is well- known by law enforcement, prosecutors, correctional officers, and others.

84.     Predictably, within hours of his placement in general population at Hazelton, inmates believed to be from New England and who are alleged to have Mafia ties or loyalties, killed James Bulger, Jr. utilizing methods that included the use of a lock in a sock-type weapon.

85.     USP Hazelton by all accounts was not an appropriate placement of James Bulger, Jr. and was, in fact, recognized as so inappropriate, the appearance is that he was deliberately sent to his death by one or more of the defendants listed above.

86.     The recognized decision-making process in transferring an inmate in general and in this specific instance, the transfer of James Bulger, Jr., should take place after the collection and review of a number of designated documentary or computer data-generated reports.

87.     The recognized decision-making process in transferring an inmate in general and in this specific instance, the transfer of James Bulger, Jr. should take place after a group of BOP employees, some with management or upper management rank,  review the designated documentary or computer data- generated reports to inform the ultimate decision on the placement of the inmate.

88.     Such employees are all aware that Federal law, 18 U.S.C. §4042(a)(2)-(3), requires the BOP to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States" and to "provide for the protection...of all persons charged with or convicted of offenses against the United States."

89.      For obvious reasons, the precise identities or titles of the individuals who are directly involved in the recognized decision-making process in transferring an inmate in general and in this specific instance, the transfer of James Bulger, Jr. are not known to the general public, including the Plaintiff and his counsel.

90.     Likewise, the precise title or names of the particular designated documentary or computer data- generated reports are not known to the general public, including the Plaintiff or his counsel.

91.    Upon information and belief, at the time James Bulger, Jr. was at Coleman II, the defendants described above were tasked to work together in a unknown but coordinated way to access and review the unknown but designated data regarding James Bulger, Jr. to inform the decision whether to transfer him at all, and if a transfer was contemplated, to assess the appropriate and safe institution, and institutional setting to place him.

92.    Upon information and belief, the defendants described above at USP Hazelton were tasked to work together in a unknown but coordinated way to access and review the unknown but designated data regarding James Bulger, Jr. to inform the decision whether the anticipated placement at USP Hazelton was an appropriate placement for him and if not to reject, protest, or seek to stop such a transfer.

93.    Upon information and belief, the defendants in upper management  described above, at the Regional or even National level were tasked to work together in a unknown but coordinated way to access and review the unknown but designated data regarding James Bulger, Jr. to inform the decision whether the anticipated placement at USP Hazelton was an appropriate placement for  him and if not to reject, protest, or stop such a transfer.

## COUNT I

## EIGHTH AMENDMENT:  FAILURE TO PROTECT
## (AGAINST ALL DEFENDANTS)

94.    Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

95.    Under the Eighth Amendment to United States Constitution, as well as under federal statutory law, BOP management, officials, correctional officers and staff have a

duty to protect inmates from harm caused by other inmates. Each and every Defendant owed this duty to James Bulger, Jr. while he was incarcerated in the BOP system.

96.     The defendants who are employed at FCC Coleman Complex and USP Coleman II unlawfully and in violation of James Bulger, Jr.'s constitutional rights caused his transfer to USP Hazelton when each of them knew or should have known of the high likelihood or certainty  that James Bulger, Jr. would suffer severe injury or death at the hands of one or more Hazelton inmates.

97.     The defendants who are working at FCC Hazelton Complex and USP Hazelton unlawfully and in violation of James Bulger, Jr.'s Constitutional rights accepted him into their custody, without protest and/or reasonable resistance. Moreover, once James Bulger, Jr. was in the custody of USP Hazelton, these defendants exposed him to other inmates even though they knew or should have known that such exposure would result in an attack up James Bulger, Jr. by one or more inmates and would result in his serious injury or death.

98.     All other defendants, including those who worked in the central office or at the national level in analyzing data for the use of designation of inmates for placement or were in management or upper management in the BOP hierarchy beyond the rank of wardens or managerial staff at USP Coleman II and USP Hazelton, and who knowingly participated, directed, approved and/or acquiesced in the decisions to transfer James Bulger, Jr. from USP Coleman II to USP Hazelton, and such further the decisions which acted in such a way to result in exposing James Bulger, Jr.  to the inmate(s) who attacked and killed James Bulger, Jr. at USP Hazelton, all acted unlawfully and in violation of James Bulger, Jr.'s Constitutional rights, acted with deliberate indifference to the substantial risk of harm.

99.     All defendants breached their respective duties under the Eighth Amendment of the United States Constitution to protect James Bulger Jr. from harm.

100.    As a direct and proximate result of defendants' respective breaches, James Bulger Jr. sustained injuries and was killed, rendering defendants liable for such damages which are set forth below.

**COUNT II**
**EIGHTH AMENDMENT: FAILURE TO INTERVENE**

101.    Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

102.    Individually and collectively, all defendants knew of the impropriety of transferring James Bulger Jr. to USP Hazelton, they knew of the high risk or certain risk of injury and death posed to Bulger at Hazelton, and they had reasonable opportunities up until Bulger was actually attacked and killed to intervene and avert the occurrence.

103.    Under the foregoing circumstances, under the Eighth Amendment of the United States Constitution all defendants owed a duty to plaintiff to intervene and avert the attack which victimized and killed James Bulger, Jr.

104.    Despite the foregoing, and as a matter of deliberate indifference to the substantial risk of harm, none of the defendants intervened to prevent the attack upon and the death of James Bulger, Jr.

105.    Defendants' respective conduct in failing to intervene violated James Bulger Jr.'s rights under the Eighth Amendment of the United States Constitution.

106.    As a direct and proximate result of defendants' respective violations, James Bulger Jr. sustained injuries and was killed, rendering defendants liable for such damages which are set forth below.

## COUNT III
## DAMAGES

107.    As a direct and proximate result of each defendant's unlawful conduct James Bulger, Jr. was physically attacked by one or more inmates at USP Hazelton and killed in the attack.

108.    As a direct and proximate result of each defendant's unlawful conduct James Bulger, Jr. sustained severe bodily injuries, anguish, physical pain, and death.

109.    Consequently each defendant is liable to plaintiff for the injuries to and death of James Bulger, Jr. and plaintiff is entitled to recover compensatory damages including but not limited to the following:

        a.    Damages for the physical and emotional pain and suffering experienced by James Bulger, Jr. in association with the attack;

        b.    Damages for the wrongful death of James Bulger, Jr. in accordance with applicable law.

110.    The conduct of each defendant giving rise to his or her liability to plaintiff was of such deliberately indifferent, intentional, outrageous, and/or malicious quality, that each defendant is liable to plaintiff for punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Honorable Court grant him the following relief:

1. Compensatory damages in accordance with Count III above;

2. Punitive damages against all defendants under Counts I and II of this complaint;

3. Reasonable attorneys' fees and costs in accordance with applicable law; and,

4. Such other further relief as this Court deems just.

Plaintiff hereby demands a jury trial on all Counts so triable under applicable law.

> WILLIAM M. BULGER, JR.
> Administrator of the Estate of James Bulger,
> Plaintiff
>
> */s/Jay T. McCamic*
> Jay T. McCamic, Esq. (WVSB# 2386)
> McCamic Law Firm, PLLC
> 80 12th Street, Ste. 305
> P.O. Box 151
> Wheeling, WV 26003
> Telephone: 304-238-9460
> Fax: 304-830-5324
> jay@mccamic.com
>
> *s/Anthony I. Werner*
> Anthony I. Werner, Esq. (WVSB# 5203)
> John & Werner Law Offices, PLLC
> Board of Trade Building, STE 200
> 80 - 12th Street
> Wheeling, WV 26003
> Telephone: 304-233-4380
> Fax: 304-233-4387
> awerner@johnwernerlaw.com
>
> *s/L. Dante diTrapano*
> L. Danté diTrapano, Esq. (WVSB# 6778)
> 500 Randolph Street
> Charleston, WV 25302
> Telephone: 304-343-4323
> Fax: 304-344-3684

dditrapano@cldlaw.com
Benjamin Adams, Esq. (WSB# 11454)
badams@calwelllaw.com
Alex McLaughlin, Esq. (WVSB# 9696)
amclaughlin@calwelllaw.com