IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| WILLIAM M. BULGER, JR., Administrator of the Estate of James Bulger, | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. 3:20-CV-206 |
| v. | ) ) | JUDGE JOHN PRESTON BAILEY |
| | ) ) | *(Electronically Filed)* |
| HUGH HURWITZ, *et al*. | ) ) | |
| Defendants. | ) | |

**THE UNITED STATES OF AMERICA'S MEMORANDUM IN SUPPORT OF
<u>MOTION TO DISMISS</u>**

**I.   INTRODUCTION**

In his Complaint, William M. Bulger, Jr. ("Plaintiff") alleges that two federal inmates attacked and killed his 89 year-old uncle – James "Whitey" Bulger ("Decedent") – shortly after he arrived at USP Hazelton, in October 2018, and that the murder was both predictable and avoidable. He argues that Decedent – as a "notorious South Boston mobster," one of the "most high-profile prisoners in the history of the BOP," and an accused informant, pedophile, and "killer of women" – had a target on his back, and that BOP officials and employees failed to protect him, and exposed him to an "inordinate risk of harm," when they transferred him to USP Hazelton and placed him in general population. And Plaintiff claims that, in exposing Decedent to that risk, the United States was negligent, and should be held liable for Decedent's injuries under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2674 ("FTCA").

But, as more fully explained below, Plaintiff's claim against the United States cannot go forward. Because Plaintiff does not – and cannot – allege that any BOP official or employee violated a specific, legal directive in transferring Decedent to USP Hazelton, or placing him in the

1

general population, the "discretionary function" exception applies to Plaintiff's claim and strips this Court of subject matter jurisdiction. Indeed, the Fourth Circuit has consistently held that BOP has wide discretion over inmate classification, transfers, and placement, and that plaintiffs cannot second-guess those decisions through the FTCA. And, as a result of that clear precedent, courts in this District have uniformly dismissed similar claims based on inmate-on-inmate violence.

There is no reason for a different result here. The "discretionary function" exception applies to Plaintiff's FTCA claim; the Court accordingly lacks subject matter jurisdiction over that claim; and it should dismiss the same, with prejudice.

## II.  BACKGROUND

### a.  Factual Allegations

For decades, Decedent was the leader of Boston's "Winter Hill Gang." (Dkt. No. 24 ¶¶ 36-37.) In that role – and according to various media reports, books, films, television programs, and courtroom testimony – Decedent regularly engaged in "drug dealing, bookmaking, [and] trafficking weapons," and was responsible for at least 19 murders. (*Id*. ¶¶ 32-37.) At the same time, Decedent also purportedly worked as an FBI informant, and regularly provided the Government with information regarding rival criminal outfits, including the "Boston Mafia." (*Id*. ¶¶ 34-42.)

In 1994, Decedent was indicted on racketeering and other federal charges, and fled the Boston area. (*Id*. ¶ 38.) After evading arrest for more than 16 years, and becoming one of the FBI's "Most Wanted" fugitives, Decedent was finally arrested and returned to Boston in 2011. (*Id*. ¶ 44.) At his subsequent trial – which was subject to intense media coverage – witnesses claimed that Decedent was involved in or responsible for multiple murders; that he was, in fact, a longtime FBI informant and "snitch"; and that he engaged in pedophilia. (*Id*. ¶¶ 45-53.) In November 2013, a jury convicted Decedent on dozens of counts, including racketeering, extortion,

and conspiracy, and found that Decedent directed or participated in 11 murders. (*Id.* ¶ 60.) Shortly thereafter, the court ordered Decedent to serve two consecutive life sentences – plus another five years – in federal prison. (*Id.* ¶ 61.)

At some point in 2013, Decedent was transferred to the Metropolitan Detention Center ("MDC") in Brooklyn, New York. (*Id.* ¶ 63.) During his time at MDC, Petitioner was assigned to the Segregated Housing Unit ("SHU") and effectively kept in solitary confinement. (*Id.* ¶¶ 64-65.) From there, Decedent was transferred to USP Tucson, in Arizona, where he spent additional time in the SHU and another inmate attacked Decedent and "stabbed him in the head." (*Id.* ¶¶ 72-77.) Decedent was then transferred to USP Coleman II, in Florida, where – despite being confined to a wheelchair – he "had various disputes with staff regarding treatment for his medical conditions." (*Id.* ¶¶ 79, 82-83.)

Finally, in October 2018, Petitioner was transferred to USP Hazelton – which Plaintiff describes as a "violent," "volatile," and "understaffed" facility, with a "gang-run yard" and a long history of inmate-on-inmate assaults. (*Id.* ¶¶ 84-95.) Upon his arrival at USP Hazelton, Decedent was placed in general population. (*Id.* ¶ 96.) "[W]ithin hours of [that] placement," Plaintiff alleges that inmates "believed" to be from New England, and sympathetic to the Boston Mafia, beat and killed Decedent. (*Id.*)

According to Plaintiff, "USP Hazelton ... was not an appropriate placement" for Decedent, considering his age, frailty, reputations as a "snitch" and a pedophile, and rivalry with Boston Mafia members. (*Id.* ¶¶ 97, 108.) And, in deciding to transfer Decedent to that facility, and place him in general population, Plaintiff alleges that BOP officials and employees negligently failed to assess Decedent's medical situation, to protect him from well-known dangers, and/or to intervene and prevent the attack that killed Decedent. (*See id.* at Count III.)

3

### b.     Procedural History

On October 30, 2020, Plaintiff filed his original Complaint in this matter. (*See* Dkt. No. 1.) In that Complaint, Plaintiff named 30 unidentified BOP officials and employees as defendants (the "Doe Defendants") and claimed that those individuals violated Decedent's Eighth Amendment rights by "failing to protect" him, and "failing to intervene" and prevent the October 2018 attack on him. (*Id.* at Counts I & II.) At or around the same time, Plaintiff filed an administrative tort claim with BOP, under the FTCA, and alleged that the United States negligently caused Decedent's injuries and death. (*See* Dkt. No. 24 ¶ 7.)

On June 16, 2021 – after BOP denied Plaintiff's administrative tort claim and informed him of his right "to bring suit in the appropriate United States District Court"– Plaintiff filed an Amended Complaint that added a negligence claim under the FTCA against the United States. (*Id.* ¶ 7, Count III.) As part of that negligence claim, Plaintiff alleged that BOP is required, under federal law, "to 'provide for the safekeeping, care, ... subsistence'" and "'protection ... of all persons charged with or convicted of offenses against the United States'" and that the United States, through BOP and its "correctional officers and prison officials": i) owed Decedent a series of related duties, including the duties "to medically assess inmates for appropriate medical level classification and placement ... to house inmates in a safe and secure manner ... to protect inmates from known and obvious dangers posed by other inmates ... to investigate, assess, and reasonably know of any inordinate risk[s]" to inmates, "to effectuate transfers ... in a manner that is reasonably safe and prudent ... [and] to intervene, report, or otherwise take appropriate affirmative action" when violations of established policies or duties pose "an inordinate risk of harm" to inmates (*id.* ¶¶ 125-33); ii) breached those duties – presumably by transferring Decedent to USP Hazelton and placing him in the general population there (*id.* ¶ 134); and iii) caused Decedent to be injured, and killed, as a result. (*Id.* ¶ 135.)

Notably, Plaintiff has *not* alleged that any BOP official or employee violated a mandatory protocol or specific directive in transferring Decedent to USP Hazelton and placing him in general population. To the contrary, Plaintiff merely alleges that, "[u]pon information and belief, the defendants ... were tasked to work together in an unknown but coordinated way to inform the decision" whether to transfer Decedent and place him at USP Hazelton, but either "did not undertake [those] tasks" or "failed to complete [them] in a reasonably prudent and lawful manner." (*Id*. ¶¶ 103-108.)

After Plaintiff completed service on the United States in August 2021 (*see* Dkt. Nos. 11, 15-16), the Court approved a stipulation setting October 22, 2021 as the consolidated deadline for all Defendants to respond to Plaintiff's operative Complaint. (*See* Dkt. No. 41.) In accordance with that stipulation, the United States now timely moves to dismiss Plaintiff's FTCA claim pursuant to Federal Rule of Civil Procedure 12(b)(1).

### III.  STANDARD OF REVIEW

In any civil action, the plaintiff bears the burden of establishing subject matter jurisdiction. *See McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 179 (1936); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). In the specific context of FTCA claims – like this one – that means the plaintiff must "prov[e] that a waiver of sovereign immunity exists and that the discretionary function exception ... does not apply to the Government's conduct." *Crawford v. United States*, No. 1:17-cv-224, 2019 U.S. Dist. LEXIS 92834, at *16 (N.D. W. Va. June 4, 2019).

When a defendant challenges jurisdiction – through a Rule 12(b)(1) motion to dismiss – the Court may consider evidence outside the four corners of complaint, and "no presumptive truthfulness attaches to plaintiff's allegations." *Kempker v. United States*, No. 1:19cv198, 2021 U.S. Dist. LEXIS 169013, at *30-31 (N.D. W. Va. July 6, 2021); *Reyes-Filiciano v. United States*, No. 1:18cv76, 2019 U.S. Dist. LEXIS 228968, at *9 (N.D. W. Va. Dec. 19, 2019) ("Because the

5

court's very power to hear the case is at issue ... the trial court is free to weigh the evidence to determine the existence of jurisdiction."); *Richland-Lexington Airport Dist. v. Atlas Properties*, 854 F. Supp. 400, 407 (D.S.C. 1994) (a Rule 12(b)(1) motion to dismiss does not convert into a Rule 56(a) motion for summary judgment simply because the court considers exhibits outside the pleadings). Ultimately, if "it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." *Id*. (citing Fed. R. Civ. P. 12(h)(3)).

Here, an examination of Plaintiff's Second Amended Complaint ,the statutes and regulations cited in that Complaint, and BOP's publicly-accessible Program Statements,[1] shows that Plaintiff cannot establish subject matter jurisdiction, and that the Court should dismiss his FTCA claim.

## IV. ARGUMENT

In his Complaint, Plaintiff alleges that BOP officials and employees were supposed to "work together in an unknown and coordinated way" to ensure Decedent's safety, and that they failed to do so, and negligently caused Decedent's death, when they: a) approved his transfer to USP Hazelton; and b) placed him into general population there. But BOP's housing and designation decisions are imbued with discretion and protected from review under the FTCA. Moreover, Plaintiff does not – and cannot – allege that anyone at BOP skipped a specific, mandatory step in coming to the relevant housing and designation decisions in this case. Thus, Plaintiff's claim – which ultimately attacks BOP's *judgment*, and mirrors a host of similar suits

---

[1] BOP's Program Statements can be accessed by searching its publicly-accessible policy domain, *see* https://www.bop.gov/mobile/policy/ (last visited Oct. 21, 2021) and/or through its "resources" and "policy" sites. *See* https://www.bop.gov/resources/ (last visited Oct. 21, 2021); https://www.bog.gov/policy/ (last visited Oct. 21, 2021).

that were based on inmate-on-inmate assaults, and rejected by courts in this Circuit – runs directly into the "discretionary function" exception to the FTCA, and must be dismissed for lack of jurisdiction.

> **a. BOP's Decisions – to Transfer Decedent and Place Him in General Population – Are Protected by the Discretionary Function Exception**

The FTCA acts as a limited waiver of the United States' sovereign immunity, and allows plaintiffs to bring suit against the Government "for certain torts, such as negligence, committed by federal employees acting within the scope of their employment." *Tyree v. United States*, 814 F. App'x 762, 765 (4th Cir. 2020) (quoting 28 U.S.C. § 1346(b)). However, that waiver is subject to multiple exceptions, including the "discretionary function" exception, which "insulates the United States from liability for its agents' performance of duties involving discretionary decisions." *Williams v. United States*, 50 F.3d 299, 308 (4th Cir. 1995); *see also* 28 U.S.C. § 2680(a); *Pieper v. United States*, 713 F. App'x 137, 139 (4th Cir. 2017) (the discretionary function exception is designed to protect "government policy decisions from lawsuits"); *DeOrio v. United States*, No. 0:20-cv-4129, 2021 U.S. Dist. LEXIS 163686, at *4-5 (D.S.C. Aug. 30, 2021) (explaining that the discretionary function exception applies even if the government was negligent or the employee abused his/her discretion).

To determine whether the discretionary function exception applies, courts must engage in a two-pronged inquiry. *See United States v. Gaubert*, 499 U.S. 315, 323-24 (1991). First, the court must consider "whether the challenged governmental conduct involves an element of judgment or choice," or – on the other hand – if it runs afoul of a "statute, regulation, or policy prescrib[ing] a specific course of action." *Rich v. United States*, 811 F.3d 140, 144 (4th Cir. 2015). "If there is no statute, regulation, or policy that directs the government actor's conduct, or if it affords broad discretion in the implementation of its directives, a court must proceed to the second

7

prong of the inquiry." *Jenkins v. United States*, No. 1:18-995-HMH-SVH, 2019 U.S. Dist. LEXIS 225096, at *14 (D.S.C. Dec. 30, 2019) (citing *Baum v. United States*, 986 F.2d 716, 720 (4th Cir. 1993)); *Crawford*, 2019 U.S. Dist. LEXIS 92834, at *9 ("conduct is discretionary if the actor is entrusted to exercise judgment or choice"). In the second part of the test, the court must "'determine whether [the discretionary] judgment is grounded in considerations of public policy.'" *Id.* (quoting *Little v. United States*, No. 5:11cv41, 2014 U.S. Dist. LEXIS 114273, at *5 (N.D. W. Va. Aug. 18, 2014)). Ultimately, whether the Government actors were negligent is irrelevant; "if a decision is a discretionary one, and no mandatory duties were breached," the discretionary function exception applies, and the Court lacks subject matter jurisdiction over the claim. *Park v. United States*, No. 2:15-cv-42, 2016 U.S. Dist. LEXIS 137358, at *5 (N.D. W. Va. Oct. 4, 2016) (citing *Hylin v. United States*, 755 F.2d 551, 553 (7th Cir. 1985)).

Here, the challenged BOP actions – of assessing Decedent's medical condition, transferring him to USP Hazelton, and placing him within general population – meet both of the requisite prongs. In fact, the Fourth Circuit has made clear that such decisions – of "where to place inmates and whether to keep certain individuals ... separated from another" – are "precisely the kind of determinations that the discretionary function is intended to protect." *Rich*, 811 F.3d at 146; *see also Dudley v. United States*, No. 09-4024, 2010 U.S. Dist. LEXIS 134016, at *9 (D.S.D. Dec. 15, 2010) (medical classification of inmates is a discretionary function). After all, while Congress charged BOP with protecting and safekeeping federal inmates, it afforded BOP "discretion regarding the implementation of those mandates," and did so to accomplish "the inherently policy laden endeavor of maintaining order and preserving security within our nation's prisons." *Rich*, 811 F.3d at 145; *Little*, 2014 U.S. Dist. LEXIS 114273, at *5 (affording BOP discretion in housing decisions – including whether or not to place an inmate in general population – furthers the public

policy of "preserv[ing] internal discipline and maintain[ing] institutional security"); *Brown v. United States*, 569 F. Supp. 2d 596, 600 (W.D. Va. 2008) (because the applicable regulations implicitly afford "discretion [to] prison officials in deciding whether to place an inmate in the general population, it is presumed that such decisions are grounded in public policy"); *West v. United States*, No. 5:17-cv-04241, 2018 U.S. Dist. LEXIS 116223, at *30-32 (S.D. W. Va. June 13, 2018) (placement, classification, and staffing decisions are all grounded in social, economic, security, and safety concerns), R & R adopted at 2018 U.S. Dist. LEXIS 115057; *Bethae v. United States*, 465 F. Supp. 2d 575, 583 (D.S.C. 2006) ("the decision regarding transferring an inmate to another facility is the kind that the discretionary function exception was designed to shield").

In accordance with the Fourth Circuit's holding in *Rich*, "[f]ederal district courts in West Virginia have found that FTCA negligence suits involving prisoner-on-prisoner violence are barred by the discretionary function exception." *Crawford*, 2019 U.S. Dist. LEXIS 92834, at *10 (collecting cases). And not just on a handful of occasions. Or in cases where the attack was entirely unpredictable. To the contrary, the Northern and Southern Districts of West Virginia (and courts across the Fourth Circuit) have repeatedly rejected similar FTCA claims under the discretionary function exception, including cases where an allegedly high-profile or otherwise vulnerable inmate was assaulted by another inmate, or the attack occurred after some prior warning or incident. *See*, *e.g.*, *Boles v. United States*, No. 1:20cv41, 2021 U.S. Dist. LEXIS 23983, at *16 (N.D. W. Va. Feb. 9, 2021); *Crawford*, 2019 U.S. Dist. LEXIS 92834, at *16; *West*, 2018 U.S. Dist. LEXIS 116223, at *32-33; *Park*, 2016 U.S. Dist. LEXIS 137358, at *7-9; *Little*, 2014 U.S. Dist. LEXIS 114273, at *19; *see also Carpenter v. Bragg*, No. 8:15-cv-00574, 2015 U.S. Dist. LEXIS 176616, at *3-4, 31-32 (D.S.C. Nov. 30, 2015) (dismissing inmate's FTCA claim stemming from assault by a cellmate, because, while the cellmate who attacked the inmate had

demanded that a correctional officer remove the inmate, "Plaintiff did not inform BOP officials of any specific threats made against him," and "the decision to assign Plaintiff to a cell with [his assailant] is of the type generally protected by the discretionary function exception").

For example, in *Boles*, an inmate at USP Hazelton suffered a series of superficial puncture wounds during an altercation with another inmate. 2021 U.S. Dist. LEXIS 92834, at *2. A couple of days later, the inmate was allegedly stabbed again – by either the same assailant, or one of the assailant's "known associate[s]" – and died a short time later. *Id*. at *3-4. The court dismissed the plaintiff's complaint, and each of her component "failure to protect," "failure to train," "failure to separate" and "failure to transfer" claims, under the "discretionary function" exception. *Id*. at *27-28. In doing so, the court explained that, in general, "decisions regarding separating inmates from one another, preventing inmate attacks, and controlling contraband weapons, the very decisions at issue here, are discretionary, policy-based functions." *Id*. at *19. And, in practice, that discretion carried over into each of the plaintiff's specific claims. Indeed, as the court noted in its opinion: i) while BOP had certain "common practices" related to contraband weapons, and how and when to search for and confiscate such items, there was no "mandatory directive prescribing a course of conduct" on contraband; ii) staffing decisions at USP Hazelton, "as well as the supervision and training of employees, involve an element of judgment or choice"; iii) "BOP staff retain discretion to determine where to house inmates and whether to separate certain inmates from one another"; and iv) under the applicable Program Statement, BOP staff *could*, but did not *have* to, transfer the inmate out of the SHU and into some elevated protected status. *Id*. at *17-27.

Likewise, in *Crawford*, the court dismissed an FTCA claim based on the murder of an inmate at USP Hazelton, where one inmate "used a shiv to slice [the victim inmate's] throat and kill him." 2019 U.S. Dist. LEXIS 92834, at *2. In doing so, the court made clear that, while "BOP

must provide for the protection, safekeeping, and care of inmates ... [that] does not guarantee a risk-free environment," "[d]ecisions about how to safeguard prisoners are generally discretionary," and "there is no explicit directive as to how [BOP] should fulfill its obligation to protect inmates." *Id*. at *4, 16. And, in confirming those points, the court quoted the Deputy Captain at USP Hazelton, who testified via affidavit that there are no specific statutes, regulations, or policies that mandate "'when and how BOP employees intervene in fights between inmates ... investigate and respond to the risk of altercations between inmates ... control contraband weapons ... [or] physically search inmates in the common area ... to detect contraband weapons.'" *Id*. at *17-19. As a result, the court held that it lacked subject matter jurisdiction over any failure to separate claim (in which the plaintiff alleged that prison officials should have separated the victim from his assailant roommate), as well as the failure to protect claim (where she alleged that officials should have found and confiscated the assailant's shiv). *Id*. at *17-19.

Finally – and perhaps most similarly – in *Little*, the plaintiff alleged that, "less than 24 hours after he arrived at USP Hazelton, he was attacked in his cell block by the brother of the victim who the plaintiff was convicted of killing ...." 2014 U.S. Dist. LEXIS 114273, at *1. Among other things, he argued that BOP staff were negligent in: a) failing to investigate whether "any relatives of plaintiff's victim were incarcerated in the general population at Hazelton"; and b) failing to place him in the SHU until that investigation was complete. *Id*. at *2. But the court rejected those arguments, finding that staff did not violate any "mandatory duties" and instead applied their judgment/discretion in handling and processing the plaintiff. *Id*. at *13-16. Most notably, the Court reiterated that "placement in the general population, even when notations have been made in the inmate's file regarding the heightened security concerns between the plaintiff and another group of inmates at the same facility, is within the discretion of the BOP and its staff."

*Id*. at *16 (citing *Usry v. United States*, No. 5:11cv141, 2013 U.S. Dist. LEXIS 41420, at *6 (N.D. W. Va. Mar. 25, 2013).)

Together, this Court's precedents create a clear – and broad – barrier to Plaintiff's FTCA claim. They show that, regardless of an inmate's age, infirmity, or targeted status, BOP can (and should) use its judgment in deciding where to house the inmate; that various social, economic, and security concerns impact each inmate housing decision, and there are no bright-line, mandatory rules governing those decisions; and that tort claims questioning those difficult, multi-factorial *decisions* – and casting blame on BOP for inmate-on-inmate assaults – are barred by the discretionary function exception.[2] *See*, *e.g.*, *Boles*, 2021 U.S. Dist. LEXIS 92834, at *17-27; *Crawford*, 2019 U.S. Dist. LEXIS 92834, at *17-19; *Little*, 2014 U.S. Dist. LEXIS 114273, at *13-16. Here, Plaintiff alleges that Decedent was a high-profile target, and that, as an 89-year old with a long list of well-earned enemies, he was vulnerable to attack. But courts in this Circuit have repeatedly made clear that such allegations – even if true – are not sufficient to get around the discretionary function exception. Quite simply, BOP retains broad discretion over where to place inmates like Decedent, and the Court should therefore dismiss Plaintiff's FTCA claim.

      **b.**      **BOP Did Not Violate Any Mandatory Directive in Coming to Its Decision to Transfer and Place Decedent at USP Hazelton**

While BOP's transfer and placement *decisions* are clearly protected by the discretionary function exception, a plaintiff may – in certain rare situations – survive a motion to dismiss if BOP failed to undertake some mandatory *procedural* step related to prison safety. *See*, *e.g.*, *Rich*, 811

---

[2] To the extent Plaintiff alleges the United States was negligent in failing to properly train and/or supervise BOP staff (*see* Dkt. No. 24 ¶¶ 122, 131), that claim must also be dismissed under the discretionary function exception. *See Boles*, 2021 U.S. Dist. LEXIS 23983, at *19-20 ("Decisions of hiring, supervising, and training employees essentially involve judgment and policy considerations, and are 'precisely the types of decisions that are protected under the discretionary function exception.'" (quoting *LeRose v. United States*, 285 F. App'x 93, 96-97 (4th Cir. 2008))).

F.3d at 146 (allowing discovery regarding an alleged failure to conduct a pat-down). But this is not one of those situations, because: i) Plaintiff does not cite to any procedural directive in his Complaint – let alone allege that BOP actually skipped a specific, mandatory step when it transferred Decedent to USP Hazelton and placed him in general population; and ii) Plaintiff is not able to do so going forward, because (and as the cases cited in Section IV.A demonstrate) BOP's transfer- and designation-related procedures are imbued with flexibility and – in this case – BOP indisputably adhered to the only relevant intake protocol that *might* be considered non-discretionary. Thus, Plaintiff's FTCA claim cannot be saved through amendment or discovery, and should be dismissed.

First, Plaintiff cites only to general, statutory language in his operative Complaint, which merely provides that BOP must "care" for and "safekeep" federal inmates. (Dkt. No. 24 ¶¶ 100, 125.) He does not point to a particular regulation, policy, Program Statement, or other rule that dictates exactly *how* BOP is to do that. And without making such an allegation – and pointing to a particular procedure that BOP *must* follow when making housing-related decisions, and that BOP failed to follow here – Plaintiff cannot establish jurisdiction. *See, e.g., Evans v. United States,* No. 3:15-cv-64, 2016 U.S. Dist. LEXIS 119154, at *17-18 (N.D. W. Va. Apr. 11, 2016).

Second, the relevant Program Statements preclude Plaintiff from making such allegations in any further-amended Complaint, and avoiding the discretionary function exception. Indeed, as courts in this Circuit have repeatedly noted, those Program Statements are devoid of such mandatory directives. (*See supra* at 8-10.) Instead, they provide and are explicitly framed as guidance; as suggestions for BOP to consider when evaluating inmates and their housing situations; and as sign-posts to assist BOP in making those complex, policy-laden decisions. For example, BOP's "Care Level Classification for Medical and Mental Health Conditions or

Disabilities" is described as "Clinical *Guidance*," and designed to provide "*recommendations* for classifying inmates' medical and mental health conditions so that [they] can be assigned to BOP institutions that can best meet their health care needs." (*See* https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf (last visited Oct. 22, 2021), at 1, 3 (emphasis added).) In doing so, the policy explains that: there are "four levels in the BOP medical care level classification system" – for both inmates and institutions; inmates can be redesignated from time-to-time; and, in "general," certain conditions *may* correlate to certain classification levels. (For example, an inmate with cancer that is in "partial remission" will generally be classified as Level 3, while an inmate whose cancer requires "systemic chemotherapy, radiation, or organ transplantation" should likely be designated Level 4). (*Id*. at 3-4, 9-10.) Nowhere, however, does the policy mandate that an inmate of a certain age, or with a certain condition, be designated at a given level. (*See id*.) *See Dudley*, 2010 U.S. Dist. LEXIS 134016, at *9. And that makes sense. Because, again, Congress purposefully afforded BOP discretion in housing matters to further public policy goals, and to ensure BOP has the necessary latitude to weigh multiple, complex factors when deciding if a particular institution is capable of caring for a particular inmate, including the needs of the thousands of other inmates under BOP control, and the available resources and staff at each institution. (*See supra* at 8-10 (citing cases finding that considerations of public policy lie behind the BOP's discretion over inmate classification).)

Likewise, BOP's "Inmate Security Designation and Custody Classification" Program Statement makes clear that, in determining where to place inmates, staff must always "exercise their professional judgment." (*See* https://www.bop.gov/policy/progstat/5100_008cn.pdf (last visited Oct. 22, 2021), at 3.) To that end, the chapter discussing Inmate Transfer does not include a list of precise protocols that BOP staff must follow, even when transferring high-profile, elderly,

14

or infirm inmates, or inmates under threat or at risk of potential harm. (*See id*. at 78-96.) Instead, the chapter merely requires staff to "note any Security Threat Group concerns/associations" in the transfer form, and "closely review" and "note" any "CIM concerns"[3] when *evaluating* the transfer request. (*Id*. at 78-79.) But that is as far as it goes. Because, at the same time, the chapter also makes clear that a change in "Custody Level" need not always result in a transfer. (*Id*. at 80-81.) At most, then, the policy *may* require BOP staff to make notations in an inmate's file when evaluating a potential transfer or change in designation. But it never mandates a particular result. Instead, BOP staff retain flexibility and discretion to assign inmates as they see fit – regardless of what "concerns" or "notes" appear in the inmate's record. *See*, *e.g.*, *Usry*, 2013 U.S. Dist. LEXIS 41420, at *23-24 ("the final decision regarding where to place the inmate as a result of [the prescribed] process and information gathering is one of discretion for the staff"); *see also Bethae*, 465 F. Supp. 2d at 583 (BOP's discretion over transfer decisions furthers public policy).

Finally, while certain protocols in Program Statement 5290.15 – covering "Intake Screening" – *could* be seen as potentially mandatory, BOP indisputably followed those steps here. As this and other Fourth Circuit courts have recognized, that Program Statement states that, "before placing [an] inmate in the institution's general population," staff must conduct "[s]ocial and medical screening interviews" of the inmate, and "determine [whether] there are non-medical reasons for housing the inmate away from the general population." (*See* "Intake Screening," available at https://www.bop.gov/policy/progstat/5290_015.pdf (last visited Oct. 21, 2021).) *See*

---

[3] "CIM" stands for "Central Inmate Monitoring." As explained in the definitions section of the "Inmate Security Designation and Custody Classification" Program Statement: "The Bureau monitors and controls the transfer, temporary release, and community activities of certain inmates who present special needs for management. Such inmates, known as Central Inmate Monitoring cases, require a higher level of review prior to any movement outside the institution." (*Id*. at 12.)

*also Usry*, 2013 U.S. Dist. LEXIS 41420, at *18-21; *Little*, 2014 U.S. Dist. LEXIS 114273, at *15 ("[S]taff is only required to conduct the actual interview and consider certain information ... [H]ow that information is considered is a matter of discretion"). While Plaintiff does not include any allegations regarding that intake process in his Second Amended Complaint, or cite to Program Statement 5290.15, the Court should nonetheless be aware that – in this case – BOP did, in fact, conduct the requisite interviews when Decedent arrived at USP Hazelton. (*See* Decl. of J. Brawley, Ex. A at 1 (documenting an initial "social interview" that was conducted at 7:25 PM on the evening Decedent arrived at USP Hazelton, referring Decedent to a psychological evaluation one hour later, and indicating that BOP staff reviewed Decedent's PSI and Central File before marking him "OK for general population").)

Thus, Plaintiff does not, and cannot, allege that BOP failed to follow any mandatory directive regarding Decedent, and his FTCA claim must be dismissed.[4]

## V. CONCLUSION

Because the discretionary function exception applies to BOP's designation and housing decisions, and because Plaintiff cannot allege that BOP skipped some mandatory, procedural directive in evaluating Decedent's transfer to, and placement within, USP Hazelton, this Court lacks subject matter jurisdiction over Plaintiff's FTCA claim, and should dismiss the same.

---

[4] To be clear, Plaintiff cannot avoid dismissal by arguing that BOP should have used its discretion differently, and kept Decedent at another facility, placed him in the SHU, or otherwise cordoned him off from potential threats. *See*, *e.g.*, *Little*, 2014 U.S. Dist. LEXIS 114273, at *16 ("[P]lacement in the general population, even when notations have been made in the inmate's file regarding the heightened security concerns between the plaintiff and ... a group of inmates at the same facility, is within the discretion of the BOP and its staff.")

Respectfully submitted,

STEPHEN R. KAUFMAN
Acting United States Attorney

*/s/ Adam Fischer*
ADAM FISCHER
Assistant U.S. Attorney
Western District of Pennsylvania
Joseph F. Weis, Jr. U.S. Courthouse
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
(412) 894-7343
PA ID No. 314548


WILLIAM J. IHLENFELD, II
United States Attorney

*/s/ Erin K. Reisenweber*
Erin K. Reisenweber
Assistant U.S. Attorney/NDWV
217 West King Street, Suite 400
Martinsburg, WV 25401
(304) 262-0590
Erin.Reisenweber@usdoj.gov
W.Va. Bar No. 9537


*Counsel for the United States of America*

## CERTIFICATE OF SERVICE

    I hereby certify that on this 22nd day of October, 2021, a true and correct copy of the within *The United States of America's Memorandum in Support of Motion to Dismiss* was served by ECF and/or first class mail upon all counsel of record.

                      */s/ Erin K. Reisenweber*
                      Erin K. Reisenweber
                      Assistant U.S. Attorney