**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

WILLIAM M. BULGER, JR.
Administrator of the Estate of James Bulger,

      Plaintiff,

v.                                     Civil Action No.: <u>3:20-cv-206</u>

HUGH HURWITZ, et al.

      Defendants.

**PLAINTIFF'S RESPONSE TO INDIVIDUAL DEFENDANTS'
MOTION TO DISMISS
(*Bivens* Individual Claims)**

**Table Contents**

I. Defendants' Contention That Plaintiff's Claims Are Time-Barred Is Misguided..... 5

II. The Court Should Either Deny Defendants' Motion As Based Upon Personal Jurisdiction Contentions Or Defer A Ruling Until A Reasonable Opportunity For Discovery Is Afforded ....................................................................................... 9

III. The Bivens Claims Brought By The Plaintiff Are Well Recognized And Ground In Established Law. ........................................................................................... 14

   A. The Claims in this Matter Do Not Present a "New Context" Calling for an "Extension" or "Expansion" of *Bivens* liability...................................................... 15

   B. As The Claims In This Matter Do Not Present A "New Context," this Court Need Not Entertain a "Special Factors" Analysis Suggested By The Defendants. 18

IV. Defendants' Qualified Immunity Contentions Are Unavailing............................ 19

## Cases

*Alba v. Randle*, 2011 WL 4565752 (S.D. Miss. Sept. 29, 2011) ........................................ 12

*Barker v. Keeley*, 2020 U.S. Dist. LEXIS 258544 ............................................................... 6

*Baxley, et al. v. Betsy Jividen, WVDCR, et al.,* Case No. 3:18-1526 ............................... 19

*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971) .................................................................. 5, *passim*

*Brodnik v. Lanham*, Civil Action No. 1:11-0178, 2016 U.S. Dist. LEXIS 100051 ............ 20

*Caldwell v. Lappin,* 2010 WL 334867 (N.D.W. Va. Jan. 28, 2010) .................................. 12

*Carlson v. Green*, 446 U.S. 14 (1980) ................................................................................ 15

*Columbia v. Haley*, 738 F.3d 107, 118, 2013 U.S. App. LEXIS 24866, *21, 2013 WL 6570949 ... 19

*D.C. v. Wesby*, 138 S. Ct. 577 (2018) ................................................................................ 26

*Davis v. Passman*, 442 U.S. 228 (1979) ............................................................................ 15

*Dunn v. Rockwell*, 225 W.Va. 43, 53, 689 S.E.2d 255, 265 (2009) .................................. 8

*Farmer v. Brennan*, 511 U.S. 825 (1994) ........................................................ 16, 24, *passim*


*Gaither v. City Hospital, Inc.*, 199 W.Va. 706, 487 S.E.2d 901 (1997) ............................. 8

*Grace v. Sparks*, 2015 U.S. Dist. LEXIS 156323 .............................................................. 7

*Hammonds v. Wolfe*, 2021 U.S. Dist. LEXIS 86167, *20 2021 WL 1792137 ................... 20

*Henry v. Purnell*, 501 F.3d 374, 377, 2007 U.S. App. LEXIS 22436, ............................... 19

*Hernandez v. Mesa*, 140 S. Ct. 735, 741 (2020) ............................................................... 15

*Hill v. Pugh*, 75 F. App'x 715 (10th Cir. 2003) ................................................................. 12

*Hope v. Peltzer*, 536 U.S. at 730 (2002) ........................................................................... 26

*Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004) ......... 5

*Miltier v. Beorn*, 896 F.2d 848, 854, 1990 ....................................................................... 13

*Nasim v. Warden, Md. House of Correction*, 64 F.3d 951, 1995 U.S. App. LEXIS 26108 ............ 6

*Newkirk v. Enzor*, 674 Fed. Appx. 276, 281 2017 U.S. App. LEXIS 202, *11 2017 WL 56718 ...... 20

*Raub v. Bowen*, 960 F. Supp. 2d 602, 613, 2013 U.S. Dist. LEXIS 109122, *30, 2013 WL 3992408 ................................................................................................................ 20

*Raynor v. Pugh*, 817 F.3d 123, 127-28 (4th Cir. 2016) ..................................................... 23

*Rhodes v. Chapman,* 452 U.S. 337, 349 (1981) ................................................................ 17

*Starling v. United States,* 664 F. Supp. 2d 558 (D.S.C. 2009) ......................................... 12

*Taylor v. Riojas*, 141 S. Ct. 52 (2020) ............................................................................... 26

*United States v. Kubrick*, 444 U.S. 111, 122-24, 62 L. Ed. 2d 259, 100 S. Ct. 352 (1979)." 64 F.3d 951, 955, 1995 U.S. App. LEXIS 26108 ................................................................... 6

*USA v. Bellinger,* 1:12cr100-02 ........................................................................................ 27

*USA v. Israel Diaz*, 1:09cr94 ............................................................................................ 31

*USA v. James Odeneal*, Criminal No. 1:19-cr-68 ............................................................ 32

*USA v. Leo Hackett, Anthony Young, Demetrius Palmer, Antoine Giles, Dashean Bradley, and Carlton Robinson*, Criminal No. 1:11-cr-51 ............................................................... 32

*USA v. Marricco Sykes*, 1:16cr16 ..................................................................................... 32

*USA v. Michael Owle and Ruben Laurel* 1:17cr39 ........................................................... 32

*USA v. Patrick Andrews and Kevin Marquette Bellinger*, 1:12-cr-100 ............................................ 32

*USA v. Stephen C. Crawford,* 1:20-cr-00017 ......................................................................... 32

*Weirton Area Water Bd. v. 3M Co.*, 5:20-CV-102 .................................................................. 9

*Williams v. Lynch*, 2018 WL 4140667 (D.S.C. Aug. 30, 2018) ................................................ 12

*Wilson v. Garcia*, 471 U.S. 261, 276, 105 S.Ct. 261, 85 L.Ed.2d 254 (1985) ..................... 5

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) ............................................................................. 18

**Statutes**

18 U.S.C. § 4042(a)(2)-(3) ................................................................................................... 26

28 U.S.C. § 2671 ................................................................................................................... 7

W.Va. Code § 55-2-12(b) ..................................................................................................... 6

W.Va. Code §56-3-33 ......................................................................................................... 10

Comes now the Plaintiff, by and through counsel, for his Response to the Defendant's Motion to Dismiss at Doc. 50 and Memorandum in Support at Doc. 50-1 and who states as follows:

## I. Defendants' Contention That Plaintiff's Claims Are Time-Barred Is Misguided

As their primary argument for a Rule 12(b) dismissal, the individual defendants claim the statute of limitations against them has expired, and for this they rely upon caselaw deeming John/Jane Doe claims ineligible for Federal Rule of Civil Procedure (FRCP) 15(c) "relation back" once the actual individuals are identified and swapped in place of the Does. As the argument goes, the death of plaintiff's decedent occurred October 30, 2018, and with the statute of limitations being two years, given that more than two years elapsed between the death and the September 1, 2021, filing of the Second Amended Complaint which names the individual defendants, plaintiff is simply too late, for FRCP 15(c) is unavailable to him. However, this is just a straw man argument, for the legal concepts of "accrual" and "discovery" are what allow the claims to proceed. Rule 15(c) is not needed.

Both federal law and state law are implicated here. Because federal law itself provides no limitations period on a claim based on *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971) (*Bivens* claim), the law of the forum state applies.

> Since there is no federally prescribed statute of limitation for a *Bivens* action, Courts look to and apply their respective State's statutes of limitation. See *Wilson v. Garcia*, 471 U.S. 261, 276, 105 S.Ct. 261, 85 L.Ed.2d 254 (1985)(*overruled on other grounds by, Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004)). Under West Virginia law, the applicable period of limitation

upon a plaintiff's right to file a personal injury is two-years from the time the cause of action accrued.  See W.Va. Code § 55-2-12(b).

*Barker v. Keeley*, 2020 U.S. Dist. LEXIS 258544, *32.

Defendants acknowledge and seize upon this standard at page 6 of their Memorandum.

However, it is federal law that dictates when the cause of action factually accrues, in other words, when it arises.  *Nasim v. Warden*, *Md. House of Correction*, 64 F.3d 951, 1995 U.S. App. LEXIS 26108.  A Fourth Circuit case, *Nasim* states, "[u]nder federal law a cause of action accrues when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action.  *See United States v. Kubrick*, 444 U.S. 111, 122-24, 62 L. Ed. 2d 259, 100 S. Ct. 352 (1979)." 64 F.3d 951, 955, 1995 U.S. App. LEXIS 26108, *11-12.  *Nasim* then offers elaboration which is of unquestionable import toward the instant action.

> In *Kubrick*, the Court held that for a cause of action to accrue, it is critical that the plaintiff know that he has been hurt **and who inflicted the injury**.  Once imputed with that knowledge, the plaintiff is on inquiry notice, imposing on him a duty to inquire about the details of negligence that are reasonably discoverable.  "To excuse him from promptly [making inquiry] by postponing the accrual of his claim would undermine the purpose of the limitations statute." *Id*. at 123.

Id. (bold added.)

Demonstrating that the language bolded above did not amount to mere dictum, *Nasim* summarily sets forth:

> Thus, for purposes of a §1983 claim, a cause of action accrues either when the plaintiff has knowledge of his claim or when he is put on notice--e.g., by the knowledge of the fact of injury **and who caused it**--to make reasonable inquiry and that inquiry would reveal the existence of a colorable claim.

64 F.3d 951, 955, 1995 U.S. App. LEXIS 26108, *13.

6

The fact that *Nasim* was based on §1983 instead of *Bivens* is of no consequence on the topic of accrual, and a dispute on the topic is inherently to be resolved upon factual determinations.

While the fact of the injury was of course known by plaintiff soon after his decedent's death, knowledge of the movant defendants' identities, i.e., who caused the injury, is a far different matter.  Plaintiff submits that the factual fortress of the federal prison system made even the most strenuous pre-suit inquiry into the identities of the individual defendants an effort in futility. It was only after the bringing of the *Federal Tort Claims Act*, 28 U.S.C. § 2671, (FTCA) claim against United States of America, which itself did not ripen until the exhaustion of an administrative remedy, that the revelation of some of the Doe identities could occur...and it bears emphasizing that only some of the Doe defendants have been as yet identified.

While accrual is a front-end concept associated with the statute of limitations, the discovery rule may be considered attached to the back end, tolling a running statute of limitations, and this returns us to state law.  As Judge Copenhaver of the Southern District of West Virginia has observed:

> [P]laintiffs also argue the discovery rule should toll the statute of limitations for their claims. The same tolling rules apply to both the §1983 and state tort claims. See *Wallace v. Kato*, 549 U.S. 384, 394, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007) ("We have generally referred to state law for tolling rules, just as we have for the length of statutes of limitations."); *Wade v. Danek Medical, Inc.*, 182 F.3d 281, 289 (4th Cir. 1999) (stating "in any case in which a state statute of limitations applies--whether because it is 'borrowed' in a federal question action or because it applies under *Erie* in a diversity action--the state's accompanying rule regarding equitable tolling should also apply.").

*Grace v. Sparks*, 2015 U.S. Dist. LEXIS 156323, *15.

Again, it matters not whether the legal basis for the claims is §1983 or *Bivens*, for as stated

in the Northern District of West Virginia case, *Barker v. Keeley*:

> [C]ourts look to State law to determine whether the statute of limitations is
> tolled with respect to Plaintiff's *Bivens* claim and state law claims. *Wallace
> v. Kato*, 549 U.S. 384, 394, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007)("We
> have generally referred to state law for tolling rules, just as we have for the
> length of the statute of limitations."); *Rakes v. Rush*, 2009 U.S. Dist. LEXIS
> 67728, 2009 WL 2392097, * 5 (S.D.W.Va. Aug. 4, 2009)(J.
> Copenhaver)(citing Board of *Regents v. Tomanio*, 446 U.S. 478, 100 S.Ct.
> 1790, 64 L.Ed.2d 440 (1980)).

2020 U.S. Dist. LEXIS 258544, *33-34.

Both the *Barker* and the *Grace* decisions turned to two seminal decisions for West

Virginia's law on the discovery rule--*Gaither v. City Hospital, Inc.*, 199 W.Va. 706, 487

S.E.2d 901 (1997) and *Dunn v. Rockwell*, 225 W.Va. 43, 53, 689 S.E.2d 255, 265 (2009),

with Judge Copenhaver's decision offering:

> In *Dunn v. Rockwell*, the Supreme Court of Appeals discussed proper
> application of the discovery rule to West Virginia's statute of limitations:
>
> > In tort actions. . . the statute of limitations begins to run when the
> > plaintiff knows, or by the exercise of reasonable diligence, should
> > know (1) that the plaintiff has been injured, **(2) the identity of
> > the entity who owed the plaintiff a duty to act with due
> > care, and who may have engaged in conduct that breached
> > that duty,** and (3) that the conduct of that entity has a causal
> > relation to the injury.
> >
> > 225 W. Va. 43, 52-53, 689 S.E.2d 255 (2009) (quoting Syllabus
> > Point 4, *Gaither v. City Hosp., Inc.*, 199 W. Va. 706, 487 S.E.2d
> > 901 (1997)).  The court also held that "whether a plaintiff 'knows
> > of' or 'discovered' a cause of action is an objective test." Id. at 53.
> > **Application of the discovery rule generally requires
> > resolution of factual questions by the trier of fact.**

Id. 2015 U.S. Dist. LEXIS 156323, *15-17 (bold added.)

Here, plaintiff knew, and pled in his complaint, the job descriptions of the movant

individuals, but he did not, indeed could not, know their particular names until this civil

action was commenced.  Should the movants continue to dispute this, then it is an issue subject to factual development through discovery to ultimately be resolved by the trier of fact, as Judge Copenhaver acknowledged to be prescribed by West Virginia law.

## II. The Court Should Either Deny Defendants' Motion As Based Upon Personal Jurisdiction Contentions Or Defer A Ruling Until A Reasonable Opportunity For Discovery Is Afforded

It is so that the governmental bulwarks blocking pre-suit factual revelations make it quite difficult to substantially, or particularly, set forth the actual roles played by various of the individual defendants in the death of plaintiff's decedent.  This is especially the case for the three individual movants characterize as "high-level agency officials" (Def. Memo. P. 3)--defendants Hurwitz, Keller and Dunbar.  It is less so for the defendants from USP Coleman who the Second Amended Complaint alleges participated in the decision to send James Bulger directly to his Hazelton execution—Warden Cheatham, Warden Lockett, Unit Manager Smith, Case Manager Ruiz, and Correctional Counselor Pisaneschi.   Their transactional proximity to Bulger's death, in other words, the connection of their conduct to his death, is strong enough to warrant an outright denial of the motion as respecting them each.  At a minimum, the Court should allow discovery to ensue to flesh out the facts.

At least as to the applicable standards the parties have no dispute, and in *Weirton Area Water Bd. v. 3M Co.*, 5:20-CV-102, this Honorable Court set them forth.

> A plaintiff must make two showings to establish personal jurisdiction over a non-consenting, non-resident defendant. First, a plaintiff must show that a statute makes the defendant amenable to process. *See e.g., Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009) ("A federal district court may only exercise personal jurisdiction

over a foreign corporation if such jurisdiction is authorized by the long-arm statute of the state in which it sits and application of the long-arm statute is consistent with the due process clause of the Fourteenth Amendment."); *see also Int'l Shoe Co. v. Washington*, 326 U.S. 310, 314-15, 66 S. Ct. 154, 90 L. Ed. 95 (1945). Second, maintenance of the suit in the forum at issue must be consistent with traditional notions of fair play and substantial justice embodied in the Due Process Clause of the United States Constitution. *Int'l Shoe Co.*, 326 U.S. at 320.

West Virginia's long-arm statute extends to the constitutional maximum permitted by the Due Process Clause. W.Va. Code §56-3-33; *see also Touchstone Research Lab., Ltd. v. Anchor Equip. Sales, Inc.*, 294 F.Supp.2d 823, 827 (N.D. W.Va. 2003) (Stamp, *J.*). Thus, in West Virginia, the issue of personal jurisdiction is simple: whether the exercise of personal jurisdiction would comport with the Due Process Clause. *See Williams v. Adver. Sex LLC*, 2007 U.S. Dist. LEXIS 64858, 2007 WL 2570182, at *3 (N.D. W.Va. Aug. 31, 2007) (Keeley, J.); *see also Christian Sci. Bd. of Dirs. v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001). To comport with the Due Process Clause, a plaintiff must demonstrate that: (1) the non-resident "has 'minimum contacts' with the forum" and (2) "requir[ing] the defendant to defend its interests in that state 'does not offend traditional notions  of fair play and substantial justice.'" *Carefirst of Md., Inc.*, 334 F.3d at 397 (quoting *Int'l Shoe*, 326 U.S. at 316); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-77, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985).

2020 U.S. Dist. LEXIS 247882, *12-14.

West Virginia's long-arm statute, W.Va. Code §56-3-33, at subsection (a)(4), provides for jurisdiction over a person for "[c]ausing tortious injury in this state by an act or omission outside this state if he or she regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state".

Movants are right that at pages 4 through 7 of the Second Amended Complaint plaintiff specifies, insofar as available information permits, the job responsibilities that each movant had at the relevant point in time that connects him or her to the placement of plaintiff's decedent at USP Hazelton. That is where their rightness ends, however, for contrary to their contention that the complaint includes no further allegations that they

individually directed their conduct at West Virginia nor any allegations (*See*, Def.

Memo. P. 10), at paragraphs 111 and 113 one finds:

> 111. The Individual Defendants who are employed at FCC Coleman
> Complex and USP Coleman II unlawfully and in violation of James
> Bulger's constitutional rights caused his transfer to USP Hazelton when
> each of them knew or should have known of the high likelihood or
> certainty that James Bulger would suffer severe injury or death at the
> hands of one or more Hazelton inmates.

****

> 113. All other Individual Defendants, including those who worked in the
> central office or at the national level in analyzing data for the use of
> designation of inmates for placement or were in management or upper
> management in the BOP hierarchy beyond the rank of wardens or
> managerial staff at USP Coleman II and USP Hazelton, and who
> knowingly participated, directed, approved and/or acquiesced in the
> decisions to transfer James Bulger from USP Coleman II to USP Hazelton,
> and such furthered the decisions which acted in such a way to result in
> exposing James Bulger to the inmate(s) who attacked and killed James
> Bulger at USP Hazelton, all acted unlawfully and in violation of James
> Bulger's Constitutional rights, and acted with deliberate indifference to the
> substantial risk of harm.

These tie the movants to West Virginia, and it is important to recognize that

while they include responsibilities and participation in the decision to transfer Mr.

Bulger from USP Coleman, more importantly they home in on where he was transferred

to. Stated differently, while an issue does exist as to whether Mr. Bulger's deteriorated

health rendered him unfit for transfer anywhere, the conduct of the respective movants

which is the main, and clearly pled, focus of the case relates to the decision to put this

elderly and unwell inmate in Hazelton. The quickness and savagery of his murder is all

that needs to be known to appreciate how much of a vulnerable target he was there.

Deciding to put Bulger in Hazelton is plainly conduct directed at West Virginia from

which plaintiff's cause of action arose.  While the full extent to which each defendant

regularly participated in decisions to send inmates to West Virginia must await
discovery, it is not unreasonable to presume that Mr. Bulger was not the first inmate
transferred to Hazelton from another prison in the regular course of federal prison
conduct and business.

Movants identify a handful of cases to support their view that mere out of state
supervisory involvement in decisions to transfer is not enough to confer personal
jurisdiction, but every one of these cases involved *pro se* plaintiffs who left their
complaints clearly deficient of forum-connecting allegations. (*Caldwell v. Lappin,* 2010
WL 334867 (N.D.W. Va. Jan. 28, 2010)*, Hill v. Pugh*, 75 F. App'x 715 (10th Cir. 2003),
*Alba v. Randle*, 2011 WL 4565752 (S.D. Miss. Sept. 29, 2011) , *Williams v. Lynch*, 2018
WL 4140667 (D.S.C. Aug. 30, 2018) ,  and *Starling v. United States,* 664 F. Supp. 2d 558
(D.S.C. 2009) —all are *pro se.*) In any event, your instant plaintiff did not sue any
movant based on mere supervision over inmates at large across various states, but
rather based on individual responsibilities and involvement which led to this particular
inmate's placement at USP Hazelton, in West Virginia, with each defendant's conduct
amounting to a personal and deliberate indifference to Mr. Bulger's risk of harm in
violation of the Constitution.

Moreover, the inherent theme of movants' cited cases is that personal jurisdiction
was lacking because the allegations against the supervisory defendants simply failed to
state a viable claim.  However, the Fourth Circuit has long recognized that supervisory
liability may arise based upon a developed factual picture of actual fault on the
supervisor's part.

> Supervisory liability based upon constitutional violations
> inflicted by subordinates is based, not upon notions of
> *respondeat superior*; but upon a recognition that supervisory

12

> indifference or tacit authorization of subordinate misconduct
> may be a direct cause of constitutional injury. [citation omitted]
> The plaintiff "not only must demonstrate that the prisoners face
> a pervasive and unreasonable risk of harm from some specified
> source, but he must also show that the supervisor's corrective
> inaction amounts to deliberate indifference or 'tacit
> authorization of the offensive [practices].'" [citation omitted]

*Miltier v. Beorn*, 896 F.2d 848, 854, 1990 U.S. App. LEXIS 2375, *15-16 (4th Cir. 1990)

Ours is a far different scenario from what is commonly encountered--take the *Weirton Area Water Board* case, for instance—where a private business in some far away state with no offices in West Virginia releases into the stream of commerce a product which ultimately becomes connected to a West Virginia injury.  Here, we are dealing with a system of prisons with a strategic business practice of transferring prisoners from one location to another.  The reasons for this shall later be developed in the evidence, but the point is that this is a regular practice, and one of the prisons in this system is USP Hazelton, a prison the federal government decided to put in West Virginia. Unlike the common hypothetical business which did not choose West Virginia as a site for its product's use, the federal authorities for whom the movants work have a business site here, they use it regularly, and they used it for the placement of plaintiff's decedent, albeit for just a few hours.  Plainly, this is a more than enough of an availing of West Virginia to satisfy "traditional notions of fair play and substantial justice."

In its *Weirton Area Water Board* decision, this Honorable Court acknowledged its discretion to permit discovery prior to ruling on a Rule 12(b) personal jurisdiction dispute.

> The 'broad discretion' entrusted to district courts in their resolution of
> discovery problems applies to jurisdictional discovery. *Sportrust Assocs.
> Int'l, Inc. v. The Sports Corp.*, 304 F.Supp.2d 789, 794 (E.D. Va. 2004)

13

(citing *Carefirst of Md., Inc., v. Carefirst Pregnancy Centers, Inc.*, 334
F.3d 390, 402 (4th Cir. 2003)).

2020 U.S. Dist. LEXIS 247882, *14.

To the extent the Court harbors doubt over the strength of any movant's nexus to
West Virginia, plaintiff respectfully submits discovery should be permitted, for it is only
by the force of the rules of civil procedure that evidence associated with these federal
actors can be developed. With all these individuals being provided a unified defense
with shared counsel, proceeding places no unreasonable burden upon any of them. If
discovery fails to unearth sufficient evidence to proceed, dismissal would then be
proper.

### III. The Bivens Claims Brought By The Plaintiff Are Well Recognized And Ground In Established Law.

The defendants have repeatedly attempted to frame the issues presented in this
case as a routine prisoner placement or prison housing issue. However, as the complaint
shows, the claims are much more than that and engender a whole series of misconduct
and negligence regarding the deliberate indifference to Mr. Bulger's medical and safety
needs during his time in the BOP which has 8th Amendment implications. The
individual actors as alleged in the complaint acted or failed to act in ways that either,
through negligence failed to provide him with the appropriate medical attention and
safety protection (as alleged in the FTCA claims), or they acted through misconduct
cognizable under *Bivens*.

Defendants argue that this court should not permit the plaintiff's *Bivens* claims
because Congress "created a separate scheme whereby prisoners can bring complaints

and seek damages" (presumably referring to the FTCA which claims plaintiff did bring and which in another pleading the Defendants conveniently argue should be dismissed *ab initio.)*

The Defendants focus on a couple of recent cases where the Supreme Court has grumbled about *Bivens* and in certain "new" contexts has ruled that it should not be used to provide monetary relief to the aggrieved plaintiff. Then the defendants try to read "the tea leaves" or prognosticate as to how the Supreme court may further restrict *Bivens* claims, including Mr. Bulger's, sometime in the future. As much as the Defendants would like *Bivens* to go away it remains viable and as for Mr. Bulger's claims at least, it is here to stay.

**A. The Claims in this Matter Do Not Present a "New Context" Calling for  an "Extension" or "Expansion" of *Bivens* liability.**

Since *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971) was decided, as the defendants acknowledge, the Supreme Court has on only three occasions examined the reach of *Bivens* liability. In *Davis v. Passman*, 442 U.S. 228 (1979) where the court approved and applied *Bivens* liability for a Fifth Amendment due process claim for gender discrimination; *Carlson v. Green*, 446 U.S. 14 (1980) where the court approved and applied *Bivens* liability for an Eighth Amendment claim for failure to treat an inmate's asthma); and *Hernandez v. Mesa*, 140 S. Ct. 735, 741 (2020) where the court did not approve and would not apply *Bivens* liability in a Fourth Amendment claim over the death of an underage Mexican national who was standing on the Mexican side of the border who was shot and killed by a federal border agent who was standing on the United States side of the border.

*Hernandez* presented the court with a factually unique case, fraught with international law, various treaties, and consideration of the power of the executive branch to conduct foreign affairs. In this factually distinguishable case, the court took the opportunity to discuss its hesitation with the idea of "expanding" *Bivens*.

Here, this court must be guided by *Carlson v. Green*, 446 U.S. 14 (1980) and *Farmer v. Brennan*, 511 U.S. 825 (1994). In *Carlson* the claimant alleged that her son while a prisoner in a federal prison suffered personal injuries and died because prison officials violated, *inter alia*, his Eighth Amendment rights by failing to give him proper medical attention. The court held that a *Bivens* remedy was available to the claimant even though the allegations could have supported a suit against the United States under the Federal Tort Claims Act (FTCA). *Id, Syl*, page 14.

*Farmer v. Brennan*, 511 U.S. 825 (1994) involved a prisoner who was transgender, had undergone some hormonal and other efforts to change his gender to female and exhibited "feminine characteristics." This put him at an obvious risk of being sexually assaulted. As the court related the facts that are analogous to the facts in this matter:

> ...petitioner was placed in the USP–Terre Haute general population. Petitioner voiced no objection to any prison official about the transfer to the penitentiary or to placement in its general population. Within two weeks, according to petitioner's allegations, petitioner was beaten and raped by another inmate in petitioner's cell.

*Id at* 830.   In his complaint the court relates that Mr. Farmer alleged that:

> respondents either transferred petitioner to USP–Terre Haute or placed petitioner in its general population despite knowledge that the penitentiary had a violent environment and a history of inmate assaults,

and despite knowledge that [he] as a transsexual who "projects feminine characteristics," would be particularly vulnerable to sexual attack by some USP–Terre Haute inmates

*Id at* 830–31. The court noted that

"'The Constitution 'does not mandate comfortable prisons,' *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981), but neither does it permit inhumane ones, and it is now settled that 'the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.'" *Id*, at 832, (1994)

Likewise, the Constitution "imposes duties on these officials, who must provide humane conditions of confinement… [who] must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Id*

The court in *Farmer*, citing numerous court opinions at footnote 2, recognized, in particular that as "lower courts have uniformly held that prison officials have a duty … to protect prisoners from violence at the hands of other prisoners." Specifically stated:

Having incarcerated persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course. Prison conditions may be restrictive and even harsh, but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objectiv[e], any more than it squares with evolving standards of decency… Being violently assaulted in prison is simply not "part of the penalty that criminal offenders pay for their offenses against society. (Internal citations and quotation marks omitted.)

*Id* at 833–34

17

In *Farmer,* the court held that prison officials may be held liable under the Eighth Amendment for denying humane conditions of confinement only if they know that inmate faces substantial risk of serious harm, and they disregard that risk by failing to take reasonable measures to abate it.

Clearly this area is well- settled law and is not a new context under *Bivens*. Moreover, it must be noted that the defendants point to *no case* involving the Constitutional rights guaranteed under the 8th amendment that has held otherwise. Each of the cases cited by the defendants cite to the 4th or 5th amendments or both and circumstances outside the clear mandates of *Farmer v. Brennan*, *Carlson* and *Bivens*.

This distinction is important as was noted at the outset by the court in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) "The constitutional right is different here, since *Carlson* was predicated on the Eighth Amendment and *this claim is predicated on the Fifth*. (Emphasis added) *Id,* at 1864

**B. As The Claims In This Matter Do Not Present A "New Context," this Court Need Not Entertain a "Special Factors" Analysis Suggested By The Defendants**

The defendants in their motion spend considerable time discussing and extolling the virtues of various remedial statutes which are clearly not on point and which were not available to Mr. Bulger. It is well known that federal prisoners, their attorneys or loved ones for security reasons are not informed of the institution where they are being shipped and Mr. Bulger allegedly died within 20 hours of his arrival at his final destination - USP Hazelton. Even if he had lived long enough to enter the procedural morass of the "alternative remedial structure" (i.e., the grievance procedure required to

be exhausted by the PLRA) one would be hard pressed to find any inmate who has ever found relief in a significant claim of injuries in that structure.

In fact, the grievance procedure and the exhaustion requirements of the PLRA have been roundly criticized by commentators and courts alike as a confusing, obfuscatory process that serves to merely stifle claims of inmates, legitimate or not. See, e.g. Preserving the Rule of Law in America's Jails and Prisons: *The Case for Amending the Prison Litigation Reform Act*, Margo Schlanger & Giovanna Shay; 2008 https://repository.law.umich.edu/cgi/viewcontent.cgi?article=2261&context=articles, See also, *Baxley, et al. v. Betsy Jividen, WVDCR, et al.,* Case No. 3:18-1526, Pgs 28-31, where Judge Chambers in reviewing the state court grievance procedure highly criticized the various pitfalls and traps that ensnare inmates attempting to use the grievance process.

## IV. Defendants' Qualified Immunity Contentions Are Unavailing

A governmental official is not entitled to qualified immunity if a claim satisfies both prongs of the following test:  first, the allegations underlying the claim, if true, substantiate a violation of a federal statutory or constitutional right; and second, this violation was of a clearly established right of which a reasonable person would have known. *Columbia v. Haley*, 738 F.3d 107, 118, 2013 U.S. App. LEXIS 24866, *21, 2013 WL 6570949. Either prong of the analysis may be performed first. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009). The plaintiff bears the burden of proof on the first question, and the defendant on the second. *Henry v. Purnell*, 501 F.3d 374, 377, 2007 U.S. App. LEXIS 22436, *5. The facts considered by the court in this first prong inquiry must be viewed in a light most favorable to the plaintiff. *Brodnik v. Lanham*,

Civil Action No. 1:11-0178, 2016 U.S. Dist. LEXIS 100051, at *20 (S.D. W. Va. Aug. 1, 2016).

Ultimately, the entitlement to qualified immunity should fall to the trier-of-fact for resolution. See, *Newkirk v. Enzor*, 674 Fed. Appx. 276, 281 2017 U.S. App. LEXIS 202, *11 2017 WL 56718 (recognizing that defendant's entitlement to qualified immunity was to be determined by the fact finder); *see also Hammonds v. Wolfe*, 2021 U.S. Dist. LEXIS 86167, *20 2021 WL 1792137; *Wilson*, 2016 U.S. Dist. LEXIS 43062 at *19 (finding that qualified immunity defenses are questions of pure law only if they do not turn on issues of disputed facts). The defense is one that often requires a well-developed factual backdrop. *See Raub v. Bowen*, 960 F. Supp. 2d 602, 613, 2013 U.S. Dist. LEXIS 109122, *30, 2013 WL 3992408 (denying defendant's motion to dismiss because the record was under-developed).

Movants first challenge, at Section IV.B. of their memorandum, is that the Second Amended Complaint fails to sufficiently allege their respective acts of involvement in any constitutional violation. They claim the allegations improperly "lump" them together. This is not so.

Even with the major difficulties in gathering Bureau of Prison information outside of litigation, plaintiff's complaint sets forth the following per-movant particularized facts.

13. Hugh Hurwitz was, at all times relevant to this action, the Director of the Federal Bureau of Prisons. Hugh Hurwitz was responsible for the entire operations of the Bureau of Prisons and who because of the high-profile nature of James Bulger was or should have been apprised of the decision making regarding his placement within the Bureau of Prisons and who did or should have made the ultimate

decision as to his placement. Hugh Hurwitz is being sued in his individual capacity.

15. J.A. Keller was, at all times relevant to this action, the Director of the BOP Southeast Region. J.A. Keller was responsible for the entire operations of the Southeast Region to include FCC Coleman and USP Coleman II and who was or should have been apprised and or consulted regarding the decision making regarding his placement within the Bureau of Prisons and who did or should have made the ultimate decision as to his placement. J.A. Keller is being sued in his individual capacity.

16. Angela Dunbar was, at all times relevant to this action, the Director of the BOP Mid-Atlantic Region. Angela Dunbar was responsible for the entire operations of the Mid-Atlantic Region to include FCC Hazelton and USP Hazelton and who was or should have been apprised and or consulted regarding the decision making regarding his placement within the Bureau of Prisons and who did or should have made the ultimate decision as to his placement. Angela Dunbar is being sued in her individual capacity.

17. R.C. Cheatham, Warden of FCC Coleman Complex was, at all times relevant to this action, the Warden of FCC Coleman Complex. R.C. Cheatham was responsible for the entire operations of the of FCC Coleman Complex to include USP Coleman II and who was or should have been apprised and or consulted regarding the decision making regarding his placement within the Bureau of Prisons and who did or should have made the ultimate decision as to his placement. R.C. Cheatham is being sued in his individual capacity.

18. Charles Lockett, Warden of USP Coleman II was, at all times relevant to this action, the Warden of USP Coleman II. Charles Lockett was responsible for the entire operations of the USP Coleman II and who was or should have been apprised and or consulted regarding the decision making regarding his placement within the Bureau of Prisons and who did or should have made the ultimate decision as to his placement. Charles Lockett is being sued in his individual capacity.

19. Joseph Coakley, Warden of FCC Hazelton Complex was, at all times relevant to this action, the Warden of USP Hazelton. Joseph Coakley was responsible for the entire operations of the USP Hazelton and who was or should have been apprised and or consulted regarding the decision making regarding his placement within the Bureau of Prisons and who did or should have made the ultimate decision as to his placement. Joseph Coakley is being sued in his individual capacity.

20. Joseph Coakley, Warden of USP Hazelton was, at all times relevant to this action, the Warden of USP Hazelton. Joseph Coakley was responsible for the entire operations of the USP Hazelton and who was or should have been apprised and or consulted regarding the decision making regarding his placement within the Bureau of Prisons and who did or should have made the ultimate decision as to his placement. Joseph Coakley is being sued in his individual capacity.

21. Amy Ruiz, Case Manager at USP Coleman II, was, at all times relevant to this action, the Case Manager of USP Coleman II. Amy Ruiz was responsible for compiling, reviewing, and analyzing certain designated reports and computer data relating to James Bulger in consultation with other defendants at USP Coleman II in order to properly assess him for placement and/or transfer.

22. Jeffrey Smith, Unit Manager at USP Coleman II was, at all times relevant to this action, the Unit Manager of USP Coleman II. Jeffrey Smith was responsible for compiling, reviewing, and analyzing certain designated reports and computer data relating to James Bulger in consultation with other defendants at USP Coleman II in order to properly assess him for placement and/or transfer.

23. Alice Pisaneschi, Correctional Counselor at USP Coleman II was, at all times relevant to this action, the Correctional Counselor of USP Coleman II. Alice Pisaneschi was responsible for compiling, reviewing, and analyzing certain designated reports and computer data relating to James Bulger in consultation with other defendants at USP Coleman II in order to properly assess him for placement and/or transfer.

24. Jeremy Shirk, Case Manager at USP Hazelton was, at all times relevant to this action, the Case Manager of USP Hazelton. Jeremy Shirk was responsible for compiling, reviewing, and analyzing certain designated reports and computer data relating to James Bulger in consultation with other defendants at USP Hazelton in order to properly assess him for placement and/or transfer.

25. Anthony Mori, Unit Manager at USP Hazelton was, at all times relevant to this action, the Unit Manager of USP Hazelton. Anthony Mori was responsible for compiling, reviewing, and analyzing certain designated reports and computer data relating to James Bulger in consultation with other defendants at USP Hazelton in order to properly assess him for placement and/or transfer.

26. Brandon Boledovic, Correctional Counselor at USP Hazleton was, at all times relevant to this action, the Correctional Counselor of USP Hazelton. Brandon Boledovic was responsible for compiling, reviewing, and analyzing certain designated reports and computer data relating to James Bulger in consultation with other defendants at USP Hazelton in order to properly assess him for placement and/or transfer.

This can hardly be characterized as lumping a group of defendants together.

In later paragraphs, particularly throughout complaint pages 19-21, various factual assertions are set forth describing by place of occurrence and nature the of conduct giving rise to each defendant's liability. When these allegations are considered together with the individual-specific job description allegations set forth above, it is manifest that plaintiff has sufficiently pled the movants' personal involvement in the death of James Bulger.[1]  More, in terms of inculpatory conduct and who, specifically, committed it, must await discovery. True, at paragraphs 111-113, plaintiff groups the individual defendants into those at Coleman (¶ 111), at Hazelton (¶ 112), and from the higher echelons of management (¶ 113), in causally connecting the acts of conduct to the Constitutional violations which led to Bulger's death, but there is nothing deficient in doing this.  The separately described conduct all worked together, as is commonly seen in cases involving multiple tortfeasors, to bring about Bulger's injuries and death.

The defendants have raised repeated factual assertions, mainly that the plaintiff cannot "plausibly" show that the defendants were personally involved in violations of the 8th Amendment. This is an area that again, requires factual development through discovery. *Raynor v. Pugh*, 817 F.3d 123, 127-28 (4th Cir. 2016). As Mr. Bulger is deceased we cannot get the facts regarding cell assignments of other inmates celled near him at Tucson, Coleman, or Hazelton as potential witnesses of the direct threats to Mr. Bulger and the staff response to those threats.

It may well be that some of the defendants did not have personal involvement in the decision making of assessing Mr. Bulger's safety and medical needs but it is not

---

[1] As set forth in the response to Section II of movants' memorandum, a cause of action for supervisory liability is certainly viable. See, *Meltier v. Beorn*, *infra*. at page 10.

plausible that any of the defendants were unaware of the risk or existence of a serious injury, and with the "actual knowledge of an excessive risk" and failed to make the inference and then acted reasonably. See, *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

What we know for certain is that the handling of Mr. Bulger was not a routine placement and cell assignment matter.  The Department of Justice, of which the BOP is its largest budget item, has long been aware of the excessive risk that Mr. Bulger faced in regard to his dealing with the Mafia. The mafia has a total code of silence (*omerta)* and mafia members are extremely vicious toward anyone who violates it. This secrecy and failure of the Justice Department in cultivating inside informers made "busting up" the Mafia families difficult. Gerald Shur, an attorney in the Organized Crime Section came up with the idea of a witness protection program (WPP) often called WITSEC (Witness Security Program) which was later codified into law as part of Title V of the Organized Crime act of 1970. Mr. Shur's program protected thousands upon thousands of witnesses including those who were, as mentioned above were inmates.

Significantly, the witness protection program also helped secure thousands of convictions in organized crime and other major criminal cases which outraged mafia and other members of organized crime. Mr. Shur was lauded at his retirement and his accomplishments praised upon his death in September 2020. See, https://www.washingtonpost.com/local/obituaries/gerald-shur-founder-of-the-federal-witness-protection-program-dies-at-86/2020/09/02/6fe09696-eba5-11ea-b4bc-3a2098fc73d4_story.html

The WPP or WITSEC program was also made available to inmates. Undersigned counsel has experience representing criminal clients who became informants, who

testified or otherwise needed protection and who are serving long sentences in the BOP while formally in the WITSEC program in special prison settings, or treated the same way by placing them in state court facilities to protect them.  (For obvious reasons a citation to a specific case cannot be given in this document).

WITSEC program's history for informants in or out of prison is proof of the recognition that informants particularly in dealing with the mafia are in great risk and need protected.

Mr. Bulger was alleged to be a confidential informant who didn't play by the rules. He was convicted of various crimes including multiple murders committed as a part of a racketeering conspiracy some of which the government alleged occurred during his time as a confidential informant. This presented what had become a frequently reoccurring problem where witnesses with criminal backgrounds continued to commit crimes under the protection of the WPP. The Witness Security Reform Act of 1984 sought to address this problem by stipulating that witness "protection is prohibited where the need for a person's testimony is outweighed by the risk of danger to the public." See, "Federal Witness Protection Program: Its Evolution and Continuing Growing Pains**,**" *Criminal Justice Ethics* Volume: 16 Issue: 2 Dated: Summer/Fall 1997 Pages: 20-34 https://www.ojp.gov/ncjrs/virtual-library/abstracts/federal-witness-protection-program-its-evolution-and-continuing

The fear of anyone on the inside of the mafia crime world that kept them from talking was justified according to Washington Post's Gerald Shur obit, the mortal threat that faced witnesses who came forward to offer information of testimony was profound. To punish one informant who wore a wire for the FBI, Mr. Shur told the Associated

Press, the man's "killers jammed wires through his head and tortured him with a cattle prod."

In fact, although Mr. Bulger was apparently never considered for the WITSEC program for the reason he violated the trust of the government and numerous serious crimes, while a confidential informant the need to protect him was apparently at one time recognized by the United States and he was designated to a soft yard at Tucson. Upon attack by another prisoner there, he was transferred to a different, arguably more secure, soft yard at Coleman. Then, for reasons not clear at this time, the defendants apparently decided they'd had enough of protecting Mr. Bulger and decided to send him to Hazelton to the fate that awaits snitches and/or chomos at Hazelton.

Predictably Mr. Bulger died allegedly at the hands of two individuals the news media have identified and who have mafia and allied gang affiliations. One is alleged to be a mafia hitman from Massachusetts and the other who is linked to a known organized crime outfit with connections to a Rhode Island mafia family.

The defendants argue that somehow the assault and death of Mr. Bulger was a surprise that came about unexpectedly after a routine transfer and cell assignment. The plaintiff contends that this is clearly egregious purposeful conduct precisely of the type discussed by the defendant in Doc. 50-1 page 39-40, citing *D.C. v. Wesby*, 138 S. Ct. 577 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194 (2004) (per curiam)); *Taylor v. Riojas*, 141 S. Ct. 52 (2020); *Hope v. Peltzer*, 536 U.S. at 730 (2002).

Experience in this district has shown that USP Hazelton is particularly ill disposed, ill equipped, and repeatedly has failed to comply with the mandate of 18 U.S.C. § 4042(a)(2)-(3).

Prisoners, by and large, are left to fend for themselves both implicitly and, it is believed in the case of Hazelton, have been explicitly directed to fend for themselves.

It is believed that correctional officers have implicitly and sometimes explicitly delegated the responsibility to protect prisoners and otherwise "keep the peace or maintain order" to the gangs.

This is openly admitted by correctional officers, see testimony of Captain Poissonnier during the *Bellinger* trial.

> Q. Can you describe to the jury what this facility is like?
> What kind of facility is USP Hazelton? We're are focusing
> on the penitentiary here.
>
> A. Okay. The USP is a high security institution. A good
> portion of the inmates that are there are serving a good
> part of their life, to a life sentence. We also house maximum
> security inmates in that institution. USP Hazelton
> is a *gang run yard*, which means that there is a lot of
> different organizations within the inmate population.
> (emphasis added)

*USA v. Bellinger,* 1:12cr100-02, Trial Transcript,  06/11/14, pg. 45 regarding an inmate on inmate assault with a shiv resulting in death.

A small amount of information regarding the level of violence and the institutions' failure to control it can be gleaned through painstaking research through *pro se* filings on Pacer and other sources. However, these sources are incomplete in what information is available regarding an individual event and have large gaps because internal BOP records are not available to the general public. Additionally, on the few occasions when some probative information is made available to members of the bar in a particular civil or criminal matter, protective orders are sought by the BOP and

routinely granted, thereby preventing the sharing of information between legal professionals.

For a time, the correctional officers' union (Council of Prison Locals C-33) that represents correctional officers who work at Hazelton, gave a daily summary or log of violent incidents with very little details on their public webpage. However, that section was taken down (at least to public view) sometime ago. A *small* sample from a now closed section of the website is illustrative of the extent and types of violent activity involving weapons:

| DATE | Name of PL/Victim | Name of Def/Attacker | description of incident |
|------|-------------------|----------------------|-------------------------|
| 12/11/07 | LNU, FNU | LNU, FNU | 7:53 am, Assistance call was made, Inmate was found with a weapon.<br><br>8:50 pm, Cell fight in SHU. |
| 12/21/07 | LNU, FNU | LNU, FNU | 3:50 p.m., Body alarm in ** Unit, 6 Inmates were fighting, several weapons involved, at least 2 received stab wounds. Chemical agents used. Staff member threatened with weapon. |
| 01/09/08 | LNU, FNU | LNU, FNU | At 10:01 pm Fight with weapon in a unit, inmate received several puncture wounds. |
| 01/12/08 | LNU, FNU | LNU, FNU | 8:50 pm Assistance call in a unit, Inmate carrying weapon around, another inmate found with multiple lacerations |
| 03/13/08 | LNU, FNU | LNU, FNU | 1:20 pm Fight with weapons announced on Rec Yard. Six inmates involved. One inmate to hospital. |

| 03/20/08 | LNU, FNU | LNU, FNU | A review of video surveillance revealed inmates ****, and ****, assaulting inmate **** with a homemade weapon and their fists. |
| 04/16/08 | LNU, FNU | LNU, FNU | 1:07 pm Body alarm for fight with weapon in a Corridor, inmate received several stab wounds to head/neck. |
| 06/24/08 | LNU, FNU | 15 UNK inmates | 8:16 am During work call movement, body alarm activated in a unit. Approximately 15 Inmates belonging to a disruptive group rushed into a unit, produced weapons, and began attacking 5 other Inmates. |
| 07/02/08 | LNU, FNU | LNU, FNU | 1:23 pm Body alarm for fight with weapons in a Corridor. One inmate assaulted by another. |
| 08/11/08 | LNU, FNU | LNU, FNU | At 8:55pm, an officer called for assistance, inmates fighting with weapons. |
| 08/21/08 | LNU, FNU | LNU, FNU | At 11:56 am, An inmate was stabbed by another inmate. |
| 08/22/08 | LNU, FNU | LNU, FNU | At 11:23 am, A fight broke out with weapons in ***** corridor with 4 inmates involved. |
| 09/07/08 | LNU, FNU | LNU, FNU | At 9:56 pm, an assistance call came thru, there was a fight with weapons, 3 inmates involved in the fight |
| 09/13/08 | LNU, FNU | LNU, FNU | 8:16 am, An inmate was found in a housing unit with stab wounds. |
| 01/07/09 | LNU, FNU CO | LNU, FNU | At 4:02 pm, An inmate assaulted a staff member. The inmate had narcotics and pulled knife on officer. |

| 06/18/09 | LNU, FNU | LNU, FNU | Inmate received stab wounds to the head. |
| 08/31/10 | LNU, FNU | LNU, FNU | At 12:45p.m., several assistance calls were made for multiple inmates fighting on the recreation yard and the corridor. Weapons were involved in the fights. |
| 02/07/12 | LNU, FNU | LNU, FNU | At 2:04 p.m., a call for assistance was announced on the compound for a two on one inmate fight involving gang members with weapons. One inmate sustained puncture wounds. |
| 07/02/12 | LNU, FNU | LNU, FNU | At 2:45 p.m., an inmate fight occurred involving weapons. One Inmate was stabbed multiple times. There was no staff injuries reported. |

Inmates have reported that correctional officers at the highest levels within Hazelton on various occasions and sometimes during inmate orientation warned inmates that Hazelton is a very dangerous place and that in order to protect themselves they must acquire a shiv or a shank (homemade weapon).

It is believed that efforts by the government to investigate and prosecute inmates for weapons possession were hampered by the fact that correctional officers at the highest levels were instructing inmates to arm themselves. The obvious disconnect between law enforcement efforts to enforce the law regarding weapons possession and BOP staff's practice of encouraging inmates to possess weapons to defend themselves is and remains problematic.

It is believed that this "disconnect" resulted in discussions between the U.S. Attorney's office and the office of the Federal Public Defender on how to quickly resolve

such cases. The possible defenses of "mistake of law" or "entrapment by estoppel" were apparently never raised but the situation was clearly confusing to at least one defendant:

> THE DEFENDANT: When I got there I had an interview by the SIS of Hazelton, the Lieutenant and stuff like that and I was told by the SIS Lieutenant to arm myself because I was--this is my first time in a USP. I come from a medium, FCI Ray Brook. I had screwed up over there and I end up going to USP Hazelton so when they interview me, the Lieutenant, *I was told to arm myself because the facility is very violent. Everybody got weapons there*. It's common and used all the time. It's always shutting down. Always closed down, you know. It always come on the radio all the time, *every day people's getting stabbed*. I don't have no life but I have a--I'm a career offender. I'm gone in eight years so I arm myself, you know, like--like I was told. So when they interview me by the Warden and the AW I was told at the meeting the same thing but different--different way around. I don't know, maybe they used it to scare me because it's my first time at a USP but *I was told to arm myself*. I never used the weapon against anybody, any human being, any staff or anybody. Yeah, I was scared because I seen a lot of things there, you know. I don't belong there. That's a USP. (emphasis added)

*USA v. Israel Diaz*, 1:09cr94, Plea and Sentencing Hearing transcript September 9, 2009. Pg. 27-28

Through painstaking internet research including PACER, counsel has attempted to put together a database of specific instances of violence particularly involving weapons.  This incomplete database currently exceeds 250 pages.

This district has had a number of death eligible criminal cases relating to inmate on inmate homicide in recent years which would include but not be limited to cases in which the undersigned has been directly involved. *See eg*, *USA v. Leo Hackett, Anthony Young, Demetrius Palmer, Antoine Giles, Dashean Bradley, and Carlton Robinson*,

Criminal No. 1:11-cr-51; *USA v. Marricco Sykes*, 1:16cr16; *USA v. James Odeneal*, Criminal No. 1:19-cr-68; *USA v. Patrick Andrews and Kevin Marquette Bellinger*, 1:12-cr-100; *USA v. Michael Owle and Ruben Laurel* 1:17cr39, *USA v. Stephen C. Crawford*, 1:20-cr-00017.

Two weeks prior to Bulger's death, Congresswoman Eleanor Holmes Norton (the delegate for the District of Columbia), had likewise cited the prior killings and numerous inmate concerns about safety in a letter requesting the Inspector General to open an investigation into the "appalling" conditions at Hazelton. See https://norton.house.gov/media-center/press-releases/norton-demands-ig-investigation-of-appalling-prisoner-conditions

Six days prior to Bulger's death, West Virginia Senator Joe Manchin had written the United States Attorney General to express his "deep concerns" regarding the "dangerous continual understaffing" at Hazelton and other facilities, citing killings including the 2013 murder of a corrections officer at USP Canaan in Pennsylvania, and the two prior 2018 inmate killings at Hazelton. See https://www.manchin.senate.gov/newsroom/press-releases/manchin-leads-letter-to-sessions-urging-correction-of-staffing-shortage-at-bureau-of-prisons-

The machinations of the defendants as alleged were deliberately indifferent to the specific danger posed to Mr. Bulger and participated individually in having Mr. Bulger transferred to USP Hazelton is a matter for further discovery but on the information available at this time is clear that those individuals must remain in the case and not be dismissed.

WHEREFORE, for the reasons above, Plaintiff requests the Court deny the defendant's motion to dismiss and permit discovery to proceed.

Respectfully submitted,

*s/Jay T. McCamic*
Jay T. McCamic, Esq. (WVSB# 2386)
McCamic Law Firm, PLLC
80 12th Street, Ste. 305
P.O. Box 151
Wheeling, WV 26003
Telephone: 304-238-9460
Fax: 304-830-5324
jay@mccamic.com

*s/Anthony I. Werner*
Anthony I. Werner, Esq. (WVSB# 5203)
John & Werner Law Offices, PLLC
Board of Trade Building, STE 200
80 - 12th Street
Wheeling, WV 26003
Telephone: 304-233-4380
Fax: 304-233-4387
awerner@johnwernerlaw.com

*s/L. Dante diTrapano*
L. Danté diTrapano, Esq. (WVSB# 6778)
500 Randolph Street
Charleston, WV 25302
Telephone: 304-343-4323
Fax: 304-344-3684
dditrapano@cldlaw.com
Benjamin Adams, Esq. (WSB# 11454)
badams@calwelllaw.com
Alex McLaughlin, Esq. (WVSB# 9696)
amclaughlin@calwelllaw.com

*s/ Henry B. Brennan*
Henry B. Brennan (*Pro Hac Vice*)
20 Park Plaza #400
Boston, MA 02116
Telephone: (617) 201-5977
F: (617) 812-3066
hb@hbjustice.com

**CERTIFICATE OF SERVICE**

I hereby certify that on November 22, 2021, I electronically filed the above

motion with the Clerk of the Court using the CM/ECF system, which will send

notification of such filing to all counsel of record.


/s/Jay T. McCamic
Jay T.  McCamic, Esq.