IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Martinsburg

**WILLIAM M. BULGER, JR.**,
Administrator of the Estate of
James Bulger,

           Plaintiff

    v.                                   **Civil Action No. 3:20-CV-206**
                                          Judge Bailey

**HUGH HURWITZ, J.A. KELLER,
ANGELA DUNBAR, R.C. CHEATHAM,
CHARLES LOCKETT, JOSEPH COAKLEY,
AMY RUIZ, JEFFREY SMITH, ALICE
PISANESCHI, JEREMY SHIRK, ANTHONY
MORI, BRANDON BOLEDOVIC, JOHN/JANE
DOES 2 AND 15-30**, and **UNITED STATES
OF AMERICA**,

           Defendants.

<u>**ORDER GRANTING MOTIONS TO DISMISS**</u>

Pending before this Court are the United States of America's Motion to Dismiss [Doc. 48], the Individual Defendants' Motion to Dismiss Plaintiff's Claims Against Them [Doc. 49], and Defendants' Renewed Motion to Stay Discovery [Doc. 51]. All motions have been fully briefed and are ripe for decision.

**Factual Allegations**

For decades, Decedent was the leader of Boston's "Winter Hill Gang." In that role – and according to various media reports, books, films, television programs, and courtroom testimony – Decedent regularly engaged in "drug dealing, extortion, bookmaking, [and] trafficking weapons," and was responsible for at least 19 murders. At the same time,

1

Decedent also purportedly worked as an FBI informant, and regularly provided the Government with information regarding rival criminal outfits, including the "Boston Mafia."

In 1994, Decedent was indicted on racketeering and other federal charges, and fled the Boston area.  After evading arrest for more than 16 years, and becoming one of the FBI's "Most Wanted" fugitives, Decedent was finally arrested and returned to Boston in 2011.  At his subsequent trial – which was subject to intense media coverage – witnesses claimed that Decedent was involved in or responsible for multiple murders; that he was, in fact, a longtime FBI informant and "snitch;" and that he engaged in pedophilia.  In November 2013, a jury convicted Decedent on dozens of counts, including racketeering, extortion, and conspiracy, and found that Decedent directed or participated in 11 murders.  Shortly thereafter, the court ordered Decedent to serve two consecutive life sentences – plus another five years – in federal prison.

At some point in 2013, Decedent was transferred to the Metropolitan Detention Center ("MDC") in Brooklyn, New York.  During his time at MDC, Decedent was assigned to the Segregated Housing Unit ("SHU") and effectively kept in solitary confinement.  From there, Decedent was transferred to USP Tucson, in Arizona, where he spent additional time in the SHU and another inmate attacked Decedent and "stabbed him in the head."  Decedent was then transferred to USP Coleman II, in Florida, where – despite being confined to a wheelchair – he "had various disputes with staff regarding treatment for his medical conditions."

Finally, in October 2018, Decedent was transferred to USP Hazelton – which plaintiff describes as a "violent," "volatile," and "understaffed" facility, with a "gang-run yard" and

a long history of inmate-on-inmate assaults.  Upon his arrival at USP Hazelton, Decedent

was placed in general population.  "[W]ithin hours of [that] placement," plaintiff alleges that

inmates "believed" to be from New England, and sympathetic to the Boston Mafia, beat

and killed Decedent.

Plaintiff asserts that USP Hazelton was "not an appropriate placement" for Bulger

and that he was "deliberately sent to his death" by officials at BOP.  Based on these

allegations, plaintiff's second amended Complaint contains three counts.  Count I alleges

an Eighth Amendment **Bivens** action against a number of BOP employees.  Count II

alleges an Eighth Amendment failure to intervene action against all the individual

defendants.  Count III alleges a FTCA action against the United States for negligence.

This Court will consider the **Bivens** claims and the FTCA claim separately.

### Plaintiff's **Bivens** Claims

In his **Bivens** claims, plaintiff sues three groups of BOP officials, whom the United

States has identified through their positions ("Individual Defendants"): (1) three high-level

agency officials: Acting Director Hugh J. Hurwitz, Southeast Regional Director J.A. Keller,

and Mid-Atlantic Regional Director Angela Dunbar; (2) five officials at USP Coleman:

Warden R.C. Cheatham, Warden Charles Lockett, Unit Manager Jeffrey Smith, Case

Manager Amy Ruiz, and Correctional Counselor Alice Pisaneschi; and (3) four officials at

USP Hazelton: Warden Joseph Coakley, Unit Manager Anthony Mori, Case Manager

Jeremy Shirk, and Correctional Counselor Brandon Boledovic.  Specifically, plaintiff asserts

that Acting Director Hurwitz, Regional Directors Keller and Dunbar, and Wardens

Cheatham, Lockett, and Coakley "w[ere] or should have been apprised and or consulted

regarding the decision making regarding [Bulger's] placement within the Bureau of Prisons and . . . did or should have made the ultimate decision as to his placement[,]"  and that Case Managers Ruiz and Shirk, Unit Managers Smith and Mori, and Correctional Counselors Pisaneschi and Boledovic were "responsible for compiling, reviewing, and analyzing certain designated reports and computer data relating to James Bulger in consultation with other defendants at USP Hazelton in order to properly assess him for placement and/or transfer."

Plaintiff asserts two Eighth Amendment claims against the Individual Defendants under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).  The first alleges failure to protect.  Plaintiff claims that the defendants at USP Coleman II caused Bulger's transfer despite knowing of the likelihood that he would be harmed by other inmates and that the defendants at USP Hazelton accepted Bulger into custody without protest and exposed him to other inmates despite knowing of the likelihood of an attack.  Plaintiff further alleges that "[a]ll other Individual Defendants," including Acting Director Hurwitz and Regional Directors Keller and Dunbar, "knowingly participated, directed, approved and/or acquiesced in the decisions to transfer James Bulger from USP Coleman II to USP Hazelton, and [as] such furthered the decisions which acted in such a way to result in exposing James Bulger to the inmate(s) who attacked and killed [him.]"  Plaintiff's second claim alleges that all the Individual Defendants "knew or should have known" of the risks Bulger faced at USP Hazelton, yet failed to intervene to avert his death.

This Court finds that the failure to protect and failure to intervene claims are not cognizable under *Bivens*.  As noted by the Sixth Circuit:

Between 1971 and 1980 in a trio of decisions, the Supreme Court recognized

4

an implied cause of action by individuals who sued federal officers for violations of their constitutional rights. *Carlson v. Green*, 446 U.S. 14 (1980); *Davis v. Passman*, 442 U.S. 228 (1979); *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971). The Court reasoned that sometimes individual-rights violations could be redressed only by damages, and it had the power to create such actions unless Congress limited them. *Bivens*, 403 U.S. at 397.

Subsequent developments leave Callahan with a forbidding hill to climb. What started out as a presumption in favor of implied rights of action has become a firm presumption against them. The Supreme Court has not recognized a new *Bivens* action in the 40 years since *Carlson*. And it has repeatedly declined invitations, many just like Callahan's, to create such actions. *Ziglar v. Abbasi*, —— U.S. ——, 137 S. Ct. 1843, 1857 (2017) (collecting eight examples). Over the same period of time, it has renounced the method of *Bivens*, *Davis*, and *Carlson*. When asked "who should decide" whether a cause of action exists for violations of the Constitution, "[t]he answer most often will be Congress." *Id*. The Court has not just rejected the *Bivens* inclination that a private right of action exists when Congress is silent; it has adopted the opposite approach in statutory and constitutional cases. *See Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001).

The Court's actions over the last four decades match its words. Most

5

telling of all, it has rejected extensions of *Bivens* to claims that involve constitutional rights that *Bivens* already reaches. *Carlson*, for example, authorized a *Bivens* action for an Eighth Amendment claim of deliberate indifference to an inmate's medical needs. 446 U.S. at 16–18. But *Minneci v. Pollard* rejected a deliberate-indifference claim in the context of a privately operated prison, even if the Eighth Amendment otherwise applied there. 565 U.S. 118, 121 (2012). *Bivens* itself involved a Fourth Amendment seizure. 403 U.S. at 389–90. But just five months ago, *Hernandez v. Mesa* rejected an invitation to innovate a similar remedy for a Fourth Amendment claim arising from a cross-border shooting. —— U.S. ——, 140 S. Ct. 735, 744, 750 (2020).

*Callahan v. Fed. Bureau of Prisons*, 965 F.3d 520, 523 (6th Cir. 2020).

"The Court's repeated reluctance to extend *Bivens* is not without good reason. A *Bivens* cause of action is implied without any express congressional authority whatsoever. This is hardly the preferred course. The Supreme Court has 'recently and repeatedly said that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases.' *Sosa v. Alvarez–Machain*, 542 U.S. 692 (2004); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938) (abandoning the idea of a substantive federal common law). The Court has therefore on multiple occasions declined to extend *Bivens* because 'Congress is in a better position to decide whether or not the public interest would be served' by the creation of 'new substantive legal liability.' *Schweiker* [*v. Chilicky*], 487 U.S. at 426–27 [(1988)] (internal quotation marks omitted); *Bush* [*v.*

6

*Lucas*], 462 U.S. at 390 [(1983)] (same)." *Holly v. Scott*, 434 F.3d 287, 289–290 (4th Cir. 2006).

In his dissent in *Carlson*, Justice Rehnquist stated:

*Bivens* is a decision "by a closely divided court, unsupported by the confirmation of time," and, as a result of its weak precedential and doctrinal foundation, it cannot be viewed as a check on "the living process of striking a wise balance between liberty and order as new cases come here for adjudication." *Cf.* 336 U.S., at 89; *B. & W. Taxicab Co. v. B. & Y. Taxicab Co.*, 276 U.S. 518, 532–533 (1928) (Holmes, J., dissenting); *Hudgens v. NLRB*, 424 U.S. 507 (1976), overruling *Food Employees v. Logan Valley Plaza*, 391 U.S. 308 (1968).

446 U.S. at 32.

In *Tun-Cos v. Perrotte*, the Fourth Circuit stated:

In the almost 40 years since *Carlson*, however, the Court has declined to countenance *Bivens* actions in *any* additional context. *See Chappell v. Wallace*, 462 U.S. 296, 297 (1983) (refusing to recognize a *Bivens* remedy where enlisted servicemen alleged that their officers discriminated against them based on race); *Bush v. Lucas*, 462 U.S. 367, 390 (1983) (refusing to recognize a *Bivens* remedy where a federal employee alleged that his supervisor violated his First Amendment rights); *United States v. Stanley*, 483 U.S. 669, 671–72 (1987) (refusing to recognize a *Bivens* remedy where a serviceman alleged that military officers violated his substantive due

7

process rights); *Schweiker v. Chilicky*, 487 U.S. 412, 414 (1988) (refusing to recognize a *Bivens* remedy for alleged violations of procedural due process by Social Security officials); *FDIC v. Meyer*, 510 U.S. 471, 473–74 (1994) (refusing to recognize a *Bivens* remedy where an employee alleged that he was wrongfully terminated by a federal agency in violation of due process); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 63 (2001) (refusing to recognize a *Bivens* remedy where a prisoner alleged that a private prison operator violated his Eighth Amendment rights); *Wilkie* [*v. Robbins*], 551 U.S. at 541 [(2007)] (refusing to recognize a *Bivens* remedy where a landowner alleged that officials from the Bureau of Land Management violated the Due Process Clause); *Minneci v. Pollard*, 565 U.S. 118, 120 (2012) (refusing to recognize a *Bivens* remedy where prisoners alleged that guards at a privately operated federal prison violated their Eighth Amendment rights).

The Court's most recent guidance on the continued availability of *Bivens* actions came in *Ziglar v. Abbasi*, where the Court expressed open hostility to expanding *Bivens* liability and noted that "in light of the changes to the Court's general approach to recognizing implied damages remedies, it is possible that the analysis in the Court's three *Bivens* cases might have been different if they were decided today." 137 S.Ct. at 1856. The plaintiffs in *Abbasi* — aliens who were detained and held in the aftermath of the September 11 terrorist attacks — brought an action against certain executive

officials and the wardens of the facility in which they were held, alleging Fourth and Fifth Amendment violations premised on the harsh conditions of their confinement and alleged abuse by prison guards. *Id*. at 1851–53. The Court held that no ***Bivens*** remedy was available for the conditions-of-confinement claims and accordingly concluded that those claims should be dismissed. *See id*. at 1858–63. And it remanded the prisoner abuse claims, holding that the lower court had erred in concluding that such claims arose in the same context as ***Carlson*** and had therefore failed to engage in the proper analysis. *See id*. at 1865.[1] The ***Abbasi*** Court explained its outlook by noting that when ***Bivens***, ***Davis***, and ***Carlson*** were decided, "the Court followed a different approach to recognizing implied causes of action than it follows now." *Id*. at 1855. More expansively, it stated:

> [I]n light of the changes to the Court's general approach to recognizing implied damages remedies, it is possible that the analysis in the Court's three ***Bivens*** cases might have been different if they were decided today. To be sure, no congressional enactment has disapproved of these decisions. And it must be understood that this opinion is not intended to cast doubt on the continued force, or even the necessity, of

_____

[1] On remand, the District Court found that the prisoner abuse claims were likewise not cognizable ***Bivens*** claims. ***Turkmen v. Ashcroft***, 2021 WL 4099495 (E.D. N.Y. Sept. 9, 2021).

> *Bivens* in the search-and-seizure context in which it arose.
> *Bivens* does vindicate the Constitution by allowing some
> redress for injuries, and it provides instruction and guidance to
> federal law enforcement officers going forward.  The settled
> law of *Bivens* in this common and recurrent sphere of law
> enforcement, and the undoubted reliance upon it as a fixed
> principle in the law, are powerful reasons to retain it in that
> sphere.

922 F.3d 514, 521–22 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 2565 (2020).

In addition to *Abbasi* itself, the Fourth Circuit found that there is no *Bivens* action for retaliation for filing a grievance or complaining about circumstances.  *Earle v. Shreves*, 990 F.3d 774 (4th Cir. 2021).  Even though this Court agrees with the above decisions, it is appropriate to conduct an independent inquiry because the special factors inquiry is context specific.  In conducting that inquiry, it is clear that expanding the *Bivens* remedy is a "disfavored" judicial activity.  *Tun-Cos*, 922 F.3d at 522.

In conducting this inquiry, this Court will follow the steps outlined by Judge Flanagan in *Mays*:

> Recently, the United States Supreme Court explained that Congress is better
> positioned to extend *Bivens* liability to new contexts not previously
> recognized by the Court, and thus instructed federal district and appellate
> courts to conduct a rigorous analysis before authorizing a *Bivens* remedy in
> any new context. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856–57 (2017);

10

*see also* **Correctional Servs. Corp. v. Malesko**, 534 U.S. 61, 74 (2001); **Tun-Cos v. Perrotte**, 922 F.3d 514, 520–21 (4th Cir. 2019). The Court established the following framework governing judicial expansion of **Bivens** liability into new contexts. **Ziglar**, 137 S. Ct. at 1857–60; **Tun-Cos**, 922 F.3d at 522.

The first step requires determining whether the case involves a "new **Bivens** context" because it is "different in [any] meaningful way" from the three prior cases in which the Court has provided a **Bivens** remedy. **Ziglar**, 137 S. Ct. at 1859. "A radical difference is not required." *See* **Tun-Cos**, 922 F.3d at 522. The Court, "without endeavoring to create an exhaustive list," noted that a case might differ in a meaningful way based on:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous Bivens cases did not consider.

**Id**. at 1859–60.

In the event the case involves a new context, the court analyzes whether "special factors counseling hesitation" in expanding **Bivens** are

11

present. *Ziglar*, 137 S. Ct. at 1857 (quoting *Carlson*, 446 U.S. at 18); *Tun-Cos*, 922 F.3d at 523. This inquiry "must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Ziglar*, 137 S. Ct. at 1857–58. A special factor counseling hesitation "must cause a court to hesitate before answering that question in the affirmative." *Id*. at 1858. Extending *Bivens* to a new context is a "disfavored judicial activity" where Congress is generally better suited to determine whether a new damages remedy should be authorized. *Ziglar*, 137 S. Ct. at 1857.

The Supreme Court has emphasized two special factors that counsel hesitation in extending *Bivens* to a new context: 1) whether an "alternative remedial structure is available" and 2) whether extending *Bivens* would violate separation-of-powers principles. *Id*. at 1857–58; *see also Tun-Cos*, 922 F.3d at 525–27. Additional relevant special factors include, *inter alia*, 1) "the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself when the tort and monetary liability mechanisms of the legal system are used to bring about the proper formulation and implementation of public policies"; 2) whether Congress has previously enacted legislation in the area, "making it less likely that Congress would want the judiciary to interfere" 3) whether a damages remedy is necessary to deter future similar violations; 4) whether

the claim addresses broader policy questions delegated to an administrative agency; and 5) whether national security interests are at issue. *Id.* at 1856–63 (citing ***Wilkie v. Robbins***, 551 U.S. 537 (2007); ***Malesko***, 534 U.S. at 73–74; ***FDIC v. Meyer***, 510 U.S. 471 (1994); ***United States v. Stanley***, 483 U.S. 669 (1987); ***Chappell v. Wallace***, 462 U.S. 296 (1983); and ***Bush v. Lucas***, 462 U.S. 367 (1983)).

2020 WL 5821841, at *11.

In examining whether a claim is a new context, the "Court has made clear that, for a case to be 'different in a meaningful way from [the three] previous ***Bivens*** cases,' a radical difference is not required." ***Tun-Cos***, 922 F.3d at 523 (citing ***Abbasi***, 137 S.Ct. at 1859).

The plaintiff's claims regarding failure to protect and failure to intervene are clearly a new context. "The differences between [the ***Abbasi*** plaintiffs' prisoner abuse claims] and the one in ***Carlson*** are perhaps small, at least in practical terms. Given this Court's expressed caution about extending the ***Bivens*** remedy, however, the *new-context inquiry is easily satisfied.* . . ." ***Id.*** (emphasis in original) (citing ***Abbasi*** 137 S.Ct. at 1865).

Although even a "modest extension" of ***Bivens*** still constitutes a new context, ***Abbasi***, 137 S. Ct. at 1864, plaintiff seeks more than a modest extension of a previously recognized ***Bivens*** context. Plaintiff's claims focus on the administration of prison housing and inmate placement—a factual context distinct from the three previously recognized contexts. These claims would thus require scrutiny of new categories of conduct and a "new category of defendants"—namely, BOP employees involved in transferring inmates

13

and managing the agency's housing system. *See Tun-Cos*, 922 F.3d at 525 (quoting *Abbasi*, 137 S.Ct. at 1857). In addition, these claims intersect with the statutory scheme delegating authority over prison designation, transfer, and housing decisions to the BOP, see 18 U.S.C. §§ 3621, 4001(b)(1), which was not at issue in *Bivens*, *Davis*, or *Carlson*. As such, plaintiff's claims are likely to raise new special factors related to Congress's activity in this area. Finally, plaintiff seeks to recover under a legal theory—failure to protect or intervene—that was not at issue in any of the Supreme Court's three prior *Bivens* cases.

Other courts have held that Eighth Amendment claims alleging either failure to protect or unfit conditions of confinement arise in a new context. *See Schwarz v. Meinberg*, 761 F.App'x 732, 734 (9th Cir. 2019) (claim regarding cell conditions presented new context); *Dudley v. United States*, 2020 WL 532338, at *6 (N.D. Tex. Feb. 3, 2020) (claim for failure to protect inmate from "abuse, threats, and harassment from both officers and inmates, presents a new *Bivens* context"); *Hoffman v. Preston*, 2020 WL 58039, at *2 (E.D. Cal. Jan. 6, 2020) ("Plaintiff's Eighth Amendment failure to protect claim is a new *Bivens* context."). This Court has also found such claims to constitute a new context. *Fortuna v. Hudgins*, 5:21-CV-72 (N.D. W.Va. June 1, 2021) (Bailey, J.) (bunk assignment); *Masias v. Hodges*, 2021 WL 1558329 (N.D. W.Va. Apr. 8, 2021) (Bailey, J.) (excessive placement in special housing unit).

The finding of a new context now requires this Court to examine the "special factors" to determine whether to extend *Bivens* to cover the new context. *Earle v. Shreves*, 990 F.3d 774 (4th Cir. 2021). "And in determining whether 'special factors' are present to

14

counsel hesitation in expanding *Bivens*, courts must consider 'whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed.' *Abbasi*, 137 S.Ct. at 1857–58.  If a factor exists that 'cause[s] a court to hesitate before answering that question in the affirmative,' then a *Bivens* remedy is unavailable. *Id*. at 1858. 'In sum, if there are sound reasons to think Congress **might doubt** the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, then courts **must refrain** from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III.' *Id*. (emphasis added)." *Tun-Cos*, 922 F.3d at 523.

Applying this standard, the Fourth Circuit has declined to authorize a new *Bivens* remedy on every occasion that it has directly addressed the issue since *Abbasi* was decided. *See **Annappareddy v. Pascale***, 996 F.3d 120, 134, 138 (4th Cir. 2021) (no Fourth and Fifth Amendment claims based on manipulation of evidence during federal investigation and prosecution); *Earle*, 990 F.3d at 781 (no First Amendment claim for retaliatory disciplinary action against prisoner); *Doe v. Meron*, 929 F.3d 153, 170 (4th Cir. 2019) (no First, Fourth, and Fifth Amendment claims arising in military context); *Attkisson v. Holder*, 925 F.3d 606, 622 (4th Cir. 2019) (no Fourth Amendment claims based on alleged FBI surveillance); *Tun-Cos*, 922 F.3d at 528 (no Fourth and Fifth Amendment claims in immigration context).  *See also **Patton v. Kimble***, 847 F.App'x 196 (4th Cir. 2021) (affirming district court's dismissal of First Amendment claim under *Abbasi* without discussion).

15

Here, multiple special factors counsel against creating a new *Bivens* remedy, including: (1) Congress's grant of discretion to the BOP over prison-housing decisions and its silence with respect to creating an individual-capacity damages claim in the prison-housing context; (2) Congress's recognition of the BOP's Administrative Remedy Program (ARP) and its passage of the Federal Tort Claims Act (FTCA), which are alternative processes for redressing inmate claims related to housing; and (3) the sizable burden the government would face if this new category of prisoner litigation were authorized.

Furthermore, Congress's inaction and failure to provide a damages remedy, particularly where it has acted to enact sweeping reforms of prisoner litigation, suggest that an extension of a damages remedy for other types of mistreatment should not be judicially created. *See Abbasi*, 137 S. Ct. at 1865 ("[I]t seems clear that Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs" and Congress's declining to provide a "damages remedy against federal jailers . . . suggests [that] Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment.").

In *Mays*, Judge Flanagan discussed that, "as separation-of-powers concerns, 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform .... Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government.' *Turner v. Safley*, 482 U.S. 78, 84–85 (1987). In the context of new constitutional claims filed by

federal prisoners challenging prison policies, the Judiciary is ill suited, 'absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed.' *Ziglar*, 137 S. Ct. at 1857–58. Separation-of-powers principles thus counsel strongly against recognizing a new *Bivens* remedy in the context of plaintiff's claims challenging his termination from UNICOR, placement in administrative detention, and transfer to FCI-Gilmer. *Id*. at 1857 ('When a party seeks to assert an implied cause of action under the Constitution itself ... separation-of-powers principles are or should be central to the analysis.'); *Wetzel v. Edwards*, 635 F.2d 283, 288 (4th Cir. 1980) ('It is a rule grounded in necessity and common sense, as well as authority, that the maintenance of discipline in a prison is an executive function with which the judicial branch ordinarily will not interfere.'); *see also Bistrian v. Levi*, 912 F.3d 79, 94–96 (3d Cir. 2018) (providing similar special factors analysis in context of challenge to administrative detention and retaliation claims and noting that decisions 'to place an inmate in more restrictive detention involve[ ] real-time and often difficult judgment calls about disciplining inmates, maintaining order, and promoting prison officials' safety and security' which 'strongly counsels restraint' in recognizing a new *Bivens* remedy for such claims)." 2020 WL 5821841, at *13.

Congress has legislated extensively regarding the prison system but has never created the remedy that plaintiff now seeks from this Court. This counsels hesitation. When Congress has legislated extensively on a topic but declined to create a damages remedy, "the silence of Congress is relevant" and suggests an intent not to create such a remedy. *See Abbasi*, 137 S.Ct. at 1862. Congress's decision to delegate authority to an

agency and insulate the agency's decision-making from judicial review also "mak[es] it less likely that Congress would want the Judiciary to interfere" by authorizing a **Bivens** remedy. **Id**. at 1858.

This case exists at the intersection of two areas of extensive congressional activity: prison housing and prisoner litigation. "One of the BOP's congressionally mandated responsibilities is to determine where inmates are housed." **Wilborn v. Mansukhani**, 795 F.App'x 157, 161 (4th Cir. 2019). Title 18 U.S.C. § 3621(b) grants the BOP broad authority to place inmates in "any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau . . . that the Bureau determines to be appropriate and suitable[.]" *See also id*. § 4001(b)(1) ("The control and management of Federal penal and correctional institutions, . . . shall be vested in the Attorney General . . . ."). Importantly, as part of the 2018 First Step Act, **Congress expressly provided that "a designation of a place of imprisonment under this subsection is not reviewable by any court."** Id. (Emphasis added). This addition "recogniz[es] [the] discretionary authority of [the BOP] under § 3621(b) to make placement or transfer decisions[.]" *Jiau v. Tews*, 812 F.App'x 638, 639 (9th Cir. 2020) (citing **Rodriguez v. Smith**, 541 F.3d 1180, 1184–86 (9th Cir. 2008)). It is also consistent with the Supreme Court's longstanding view that allowing inmates to challenge their designated facility under the Constitution would "involve the judiciary in issues and discretionary decisions that are not the business of federal judges." **Meachum v. Fano**, 427 U.S. 215, 228 (1976).

While Congress has been conspicuously vocal about preventing courts from interfering with BOP housing decisions, it has been conspicuously silent about creating a remedy for prisoners to obtain damages from individual officers.   In 1995, Congress passed the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, which aims to "limit litigation brought by prisoners," *Montcalm Pub. Corp. v. Commonwealth of Va.*, 199 F.3d 168, 171 (4th Cir. 1999), and "remove the federal district courts from the business of supervising the day-to-day operation" of prisons. *Cagle v. Hutto*, 177 F.3d 253, 257 (4th Cir. 1999).   As multiple courts have noted, "Congress paid close attention to inmate constitutional claims when it enacted the [PLRA] of 1995," *Callahan v. Fed. Bureau of Prisons*, 965 F.3d 520, 524 (6th Cir. 2020), but did not create a "standalone damages remedy against federal jailers," *id*. (quoting *Abbasi*, 137 S. Ct. at 1865); *see also Butler v. S. Porter*, 999 F.3d 287, 294 (5th Cir. 2021) (making same observation and rejecting *Bivens* remedy).   In fact, because the PLRA was passed fifteen years after *Carlson*, the Supreme Court has noted that the absence of a damages remedy in the statute arguably suggests that "Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment." *Abbasi*, 137 S. Ct. at 1865. Congress created this scheme despite full knowledge that violence may occur in prisons and transfers and other decisions about housing often involve safety concerns.

Creating a *Bivens* remedy in this case would be in strong tension with Congress's decisions to give the BOP discretion over inmate placement, prohibit courts from reviewing inmate placement, and omit an individual-capacity damages remedy from the PLRA. Through its frequent legislation in the areas of prison housing and prisoner litigation,

Congress had many opportunities to create a damages remedy for situations where a housing decision leads to injury.  But it did not do so.  Instead, it has repeatedly limited judicial authority to review BOP housing decisions and to entertain claims brought by prisoners.  Viewed comprehensively, this legislative backdrop is more than enough to raise doubts about whether Congress would welcome a judicially created damages remedy for harms arising from prison-housing decisions. *See Attkisson*, 925 F.3d at 621 (denying *Bivens* remedy because "Congress has legislated extensively in the area of electronic surveillance and intrusions into electronic devices without authorizing damages for a Fourth Amendment violation"); *Tun-Cos*, 922 F.3d at 526 (rejecting *Bivens* remedy in immigration context because "Congress took steps to ensure that the protections it provided in the [Immigration and Nationality Act] would be exclusive of any additional judicial remedy" by limiting judicial review of immigration proceedings initiated by the Attorney General).

Another special factor in this case is the existence of an "alternative remedial structure" for protecting a prisoner's interest in avoiding unwanted housing placements. *See Abbasi*, 137 S.Ct. at 1858.  First, the BOP has developed the detailed ARP, through which an inmate can seek equitable relief for issues related to "any aspect of his/her own confinement," including housing. 28 C.F.R. § 542.10.  "The [ARP] process is substantial; it contains its own statutes of limitations, filing procedures, and appeals process. . . . And prisoners may retain attorneys for assistance with the process." *Callahan*, 965 F.3d at 524. For situations determined to "threaten[] the inmate's immediate health or welfare," the warden must respond to a grievance within three days.  28 C.F.R. § 542.18.  And by adding an administrative exhaustion requirement to the PLRA, *see* § 1997e(a), Congress

has incorporated the ARP into its overall scheme for resolving disputes in the prison setting.

The Fourth Circuit and other courts have thus cited the ARP as an alternative process that—together with the option of seeking injunctive relief in court—counsels against creating a ***Bivens*** remedy for claims related to prison housing and other prison matters.  *See, e.g., **Earle***, 990F.3d at 780; ***Mack v. Yost***, 968 F.3d 311, 321 (3d Cir. 2020); ***Callahan***, 965 F.3d at 524; ***Vega v. United States***, 881 F.3d 1146, 1154 (9th Cir. 2018). While the ARP does not "include a money damages remedy" or "redress constitutional violations," ***Tun-Cos***, 922 F.3d at 526–27, "the relevant question 'is not what remedy the court should provide for a wrong that would otherwise go unredressed' but instead 'whether an elaborate remedial system . . . should be augmented by the creation of a new judicial remedy.'" *Id*. at 527 (quoting ***Bush v. Lucas***, 462 U.S. 367, 388 (1983)). The ARP is the congressionally recognized means "through which allegedly unconstitutional actions and policies can be brought to the attention of the BOP and prevented from recurring." *See **Corr. Servs. Corp. v. Malesko***, 534 U.S. 61, 74 (2001). Here, although the complaint is silent on the issue, Bulger had the option of filing an administrative grievance or seeking an injunction while his transfer to USP Hazelton was pending. Additionally, although Bulger's death means he can no longer utilize the ARP or seek injunctive relief, it is the presence of that process and its availability in the context of his claims that counsels hesitation, not the possibility of relief for him now.

The Federal Tort Claims Act (FTCA) provides another alternative process by which inmates can remedy past harm related to prison housing by seeking damages from the United States. In fact, plaintiff asserts an FTCA claim in this lawsuit. Indeed, a negligence claim under the FTCA will often provide an inmate's best option to recover damages. While *Bivens* found that the interests protected by "state laws regulating trespass and the invasion of privacy" were "inconsistent or even hostile" to the Fourth Amendment's protections, 403 U.S. at 394, the Court explained in *Malesko* that "such logic does not apply" when a plaintiff can assert negligence in lieu of an Eighth Amendment claim, 534 U.S. at 73–74. In fact, "the heightened 'deliberate indifference' standard of Eighth Amendment liability . . . would make it considerably more difficult for [a plaintiff] to prevail than on a theory of ordinary negligence." *Id*. at 73 (internal citation omitted). Between the ARP, injunctions, and the FTCA, inmates have multiple alternative processes to protect their interest in safe housing.

A final special factor in this case is the substantial burden that would be placed on government operations if the Court were to authorize a new category of prison litigation. *See Abbasi*, 137 S.Ct. at 1858. Indeed, litigation is already so pervasive in the prison context that Congress has sought to curtail it through the PLRA. Other courts have refused to create new categories of prison litigation in light of the burdens they could create. In *Earle*, for example, the Fourth Circuit declined to authorize an inmate's *Bivens* claim that officials retaliated against him by placing him in the SHU, in part because doing so "would work a significant intrusion into an area of prison management that demands quick response and flexibility." 990 F.3d at 781; *see also Callahan*, 965 F.3d at 524 (recognizing

that "[p]rison-based claims . . . present a risk of interference with prison administration[,]" which counsels in favor of judicial restraint in creating a new ***Bivens*** remedy).

BOP currently houses 155,675 inmates, see Fed. Bureau of Prisons, About Our Agency, https://www.bop.gov/about/agency/ (last visited October 20, 2021), and operates 122 institutions nationwide, see Federal Bureau of Prisons, About Our Facilities, https://www.bop.gov/about/facilities/federal_prisons.jsp (last visited October 20, 2021). The agency carries out a massive number of prisoner transfers each year and relocates prisoners within facilities even more often.  The approval of a ***Bivens*** remedy in this case could spark new litigation for each of these housing decisions that would burden individual officials and drain government resources.  This new litigation would likely be frequent, protracted, and expansive.  To state a claim for failure to protect, a plaintiff must allege the existence or risk of a "serious or significant physical or emotional injury" and that the defendant was "deliberate[ly] indifferen[t] to inmate health or safety"—i.e., that they "had actual knowledge of an excessive risk." ***Raynor v. Pugh***, 817 F.3d 123, 127–28 (4th Cir. 2016).  Subjective state of mind is notoriously "easy to allege and hard to disprove," ***Nieves v. Bartlett***, 139 S. Ct. 1715, 1725 (2019) (quoting ***Crawford-El v. Britton***, 523 U.S. 574, 585 (1998)), and therefore "threaten[s] to set off 'broad-ranging discovery' in which 'there often is no clear end to the relevant evidence.'" ***Id.*** (quoting ***Harlow v. Fitzgerald***, 457 U.S. 800, 817 (1982)); *see also* ***Annappareddy***, 996 F.3d at 134 (declining to create ***Bivens*** claim that would "invite a wide-ranging inquiry into the evidence available to investigators, prosecutors, and the grand jury" (quoting ***Farah v. Weyker***, 926 F.3d 492, 500 (8th Cir. 2019))).  Inmates can also sue a wide range of officials, even if they

23

are only tangentially related to the alleged incident, as plaintiff has done here. See *Schwarz v. Meinberg*, 761 F.App'x 732, 735 (9th Cir. 2019) (acknowledging that extending *Bivens* remedies to "claims against regional and national BOP officials" would undermine *Bivens'* deterrence purpose). Consequently, recognizing a new *Bivens* claim in this context, and particularly as plaintiff has structured his claim, would be burdensome to the government and individual employees.

Based upon the foregoing, this Court is compelled to find that no *Bivens* remedy exists for plaintiff's claims against the Individual Defendants. Counts I and II of the second amended complaint will be dismissed.

### *Plaintiff's FTCA Claims*

As noted above, plaintiff alleges that two federal inmates attacked and killed his 89 year-old uncle – James "Whitey" Bulger ("Decedent") – shortly after he arrived at USP Hazelton, in October 2018, and that the murder was both predictable and avoidable. He argues that Decedent – as a "notorious South Boston mobster," one of the "most high-profile . . . federal prisoners in the history of the BOP," and an accused informant, pedophile, and "killer of women" – had a target on his back, and that BOP officials and employees failed to protect him, and exposed him to an "inordinate risk of harm," when they transferred him to USP Hazelton and placed him in general population. Plaintiff also claims that, in exposing Decedent to that risk, the United States was negligent, and should be held liable for Decedent's injuries under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2674 ("FTCA").

In its motion, the Government argues this Court lacks subject matter jurisdiction because plaintiff's claims are barred by sovereign immunity.  Although the FTCA operates as a general waiver to sovereign immunity, the Government argues that this case falls within "the discretionary function exception" to the FTCA, which is one of several types of claims in which immunity remains.  *See Dolin v. U.S. Postal Service*, 546 U.S. 481, 485 (2006) ("The FTCA qualifies its waiver of sovereign immunity for certain categories of claims (13 in all).  If one of the exceptions applies, the bar of sovereign immunity remains.").  The discretionary function exception is found in 28 U.S.C. § 2680(a) and provides that immunity is not waived for:

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

The "discretionary function" exception "insulates the United States from liability for its agents' performance of duties involving discretionary decisions."  *Williams v. United States*, 50 F.3d 299, 308 (4th Cir. 1995); *see also* 28 U.S.C. § 2680(a); *Pieper v. United States*, 713 F.App'x 137, 139 (4th Cir. 2017) (the discretionary function exception is designed to protect "government policy decisions from lawsuits"); *DeOrio v. United States*, 2021 WL 3856207, at *2 (D.S.C. Aug. 30, 2021) (explaining that the discretionary function

exception applies even if the government was negligent or the employee abused his/her discretion). *See also Hager v. United States*, 2020 WL 2544421 (S.D. W.Va. May 19, 2020) (Chambers, J.).

"The Supreme Court has explained that this exception 'marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.' *United States v. Varig Airlines*, 467 U.S. 797, 808 (1984). Although the precise contours of the exception are impossible to define, the Supreme Court made clear 'it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case.' *Id*. at 813. In this regard, a court must consider whether the acts at issue 'are of the nature and quality that Congress intended to shield from tort liability.' *Id*." *Hager v. United States*, 2020 WL 2544421, at *2.

The purpose of the exception, as the Supreme Court of the United States has explained, is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Crawford v. United States*, 2019 WL 2366017, at *3 (N.D. W.Va. June 4, 2019) (Kleeh, J.) (citing *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984)).

In any civil action, the plaintiff bears the burden of establishing subject matter jurisdiction. *See McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 179 (1936); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). In the specific context of FTCA claims – like this one – that means the plaintiff must "prov[e] that a waiver of

sovereign immunity exists and that the discretionary function exception . . . does not apply to the Government's conduct." *Crawford v. United States*, 2019 WL 2366017, at *5 (N.D. W.Va. June 4, 2019) (Kleeh, J.).  *See also, Welch v. United States*, 409 F.3d 646, 650–51 (4th Cir. 2005).

When a defendant challenges jurisdiction – through a Rule 12(b)(1) motion to dismiss – the Court may consider evidence outside the four corners of the complaint, and "no presumptive truthfulness attaches to the plaintiff's allegations." *Crawford*, 2021 WL 2366017, at *2; *LaRosa v. Pecora,* 650 F.Supp.2d 507, 510 (N.D. W.Va. 2009) (Stamp, J.) ("Because the court's very power to hear the case is at issue . . . the trial court is free to weigh the evidence to determine the existence of jurisdiction.") (Stamp, J.); *Richland-Lexington Airport Dist. v. Atlas Properties*, 854 F.Supp. 400, 407 (D.S.C. 1994) (Traxler, J.) (a Rule 12(b)(1) motion to dismiss does not convert into a Rule 56(a) motion for summary judgment simply because the court considers exhibits outside the pleadings).

In *United States v. Gaubert*, 499 U.S. 315 (1991), the Supreme Court further explained that, when discretion is authorized by "governmental policy, as expressed or implied by statute, regulation, or agency guidelines, . . . it must be presumed that the agent's acts are grounded in policy when exercising that discretion." 499 U.S. at 324. When challenged by a motion to dismiss, a complaint must contain "facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *Hager v. United States*, 2020 WL 2544421, at *2 (S.D. W.Va. May 19, 2020).

"In deciding whether the discretionary function test applies, the Supreme Court has developed a two-tier analysis.  First, a court must determine 'whether the action is a matter of choice for the acting employee.'  *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). More precisely, the court should decide whether the employee's conduct was prescribed by federal statute, regulation or policy.  *Id*.  There is no discretion when the employee is acting pursuant to a mandatory statute, regulation, or policy.  However, if the challenged conduct is not mandated, the court must move to the second part of the analysis and ask whether the action 'in an objective, or general sense' is something that would be expected to be inherently based on public policy considerations.  *Baum v. United States*, 986 F.2d 716, 720–21 (4th Cir. 1993).  A governmental actor's negligence 'is largely irrelevant to the discretionary function inquiry.'  *Id*. at 722 n.2."  *Hager*, 2020 WL 2544421, at *2.

In evaluating jurisdiction, "the Court must 'strictly construe[ ]' the FTCA and resolve 'all ambiguities ... in favor of the sovereign.'  *Robb v. United States*, 80 F.3d 884, 887 (4th Cir.1996)."  *Newbrough v. Piedmont Reg'l Jail Auth.*, 2012 WL 169988, at *2 (E.D. Va. Jan. 19, 2012) (Hudson, J.).

In *Rich v. United States*, the Fourth Circuit dealt with a similar issue:

The BOP is required to provide for the "protection," "safekeeping," and "care" of "all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2), (3).  Under the statute's broad directives, the BOP retains discretion regarding the implementation of those mandates. *Cohen v. United States*, 151 F.3d 1338, 1342 (11th Cir. 1998).   This

28

discretion is evident in the regulations regarding the proper handling and review of the Central Inmate Monitoring (CIM) files.

The CIM system is the mechanism by which the Bureau of Prisons monitors and controls the transfer, temporary release, and community activities of certain inmates who present special needs for management, including the need to separate certain inmates from others based on their past behavior. *See* 28 C.F.R. § 524.70–76. Although 28 C.F.R. § 524.72(d) provides that inmates "**may** require separation from a specific disruptive group [such as a prison gang]" (emphasis added), nothing in this regulation requires that any specific action be taken by the various prison officials. Instead, prison officials must consider several factors and exercise independent judgment in determining whether inmates may require separation. *See* 28 C.F.R. § 524.72(f). Given this general language in the regulations, we conclude that prison officials exercise broad discretion in this regard and, thus, that the first prong of the discretionary function exception is satisfied.

We turn to consider the second element of the discretionary function exception, namely, whether considerations of public policy are implicated in the discretion given to prison officials in their decisions about the separation of prisoners. *See Gaubert*, 499 U.S. at 322–23. Although this is an issue of first impression in this Court, other federal appellate courts have held that prisoner placement and the handling of threats posed by inmates against

one another are "part and parcel of the inherently policy-laden endeavor of maintaining order and preserving security within our nation's prisons." *Cohen*, 151 F.3d at 1344; *see also Alfrey v. United States*, 276 F.3d 557, 563–65 (9th Cir .2002); *Calderon v. United States*, 123 F.3d 947, 951 (7th Cir. 1997). Factors such as available resources, proper classification of inmates, and appropriate security levels are "inherently grounded in social, political, and economic policy." *Dykstra v. U.S. Bureau of Prisons*, 140 F.3d 791, 796 (8th Cir. 1998); *cf. Bell v. Wolfish*, 441 U.S. 520, 547–48 (1979) ("Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.").

We agree with the reasoning of our sister circuits. Prison officials are afforded discretion in determining where to place inmates and whether to keep certain individuals or gangs separated from one another. Because these decisions invoke several policy considerations for prison administrators, they are precisely the kind of determinations that the discretionary function exception is intended to protect. We therefore hold that the discretionary function exception shields the prison officials from liability with respect to whether they should have separated Rich from his attackers.

*Rich v. United States*, 811 F.3d 140, 145–46 (4th Cir. 2015).

"The Fourth Circuit affirmed as to the decision not to separate Rich from his attackers, finding that the discretionary function exception applied because both prongs of the test were met: it involved judgment or choice, and it was a matter of public policy. *Id*. at 146 (writing that even assuming his allegations of targeting by the white supremacist group were true, 'the discretionary function exception still would apply to the decisions of the officials regarding prisoner placement, ultimately **depriving us of jurisdiction**' (emphasis added))." *Crawford v. United States*, 2019 WL 2366017, at *5 (N.D. W.Va. June 4, 2019) (Kleeh, J.).

When a federal prisoner sues under the FTCA for injuries caused by a fellow inmate, this court and others have uniformly held the action to be barred by the discretionary function exception.   In addition to the cases referenced by the Fourth Circuit in *Rich*, *see, e.g.*, *Usry v. United States*, 2013 WL 1196650 (N.D. W.Va. Mar. 25, 2013) (Stamp, J.), *aff'd*, *Usry v. United States*, 545 F.App'x 265 (4th Cir. 2013); *Donaldson v. United States*, 281 F.App'x 75, 76–78 (3rd Cir. 2008) (upholding dismissal of an FTCA claim that federal prison employees failed to protect plaintiff from assault by a fellow prisoner on a finding that the claim was barred by the discretionary function exception); *Buchanan v. United States*, 915 F.2d 969 (5th Cir.1990) (discretionary function exception applied to FTCA claim for damages by prisoners held hostage during a prison uprising); *Graham v. United States*, 2002 WL 188573 (E.D. Pa. Feb. 5. 2002); *Boles v. United States*, 2021 U.S. Dist. LEXIS 23983, at *16 (N.D. W. Va. Feb. 9, 2021); *Crawford*, *supra*; *West v. United States*, 2018 U.S. Dist. LEXIS 116223, at *32–33; *Park v. United States*,

2016 U.S. WL 5793722 (N.D. W.Va. Oct. 4, 2016) (Bailey, J.); *Little*, *supra*; *Carpenter v. Bragg*, 2015 WL 13734632 (D.S.C. Nov. 30, 2015) (Gergel, M.J.).

Three recent cases from this District are instructive.   In *Little v. United States*, 2014 WL 4102377 (N.D. W.Va. Aug. 14, 2914) (Stamp, J.), the United States District Court for the Northern District of West Virginia examined an FTCA case involving prisoner-on-prisoner violence.   The plaintiff, Michael Little ("Little"), was convicted of murder and incarcerated at USP Hazelton.  Within 24 hours, he was attacked in his cell block by the brother of his murder victim.   Little brought an FTCA action against the Government, arguing that the staff improperly classified him; that the staff allowed him to be in a unit with family members of his victim; and that the prison staff failed to properly screen other inmates for weapons.

The Government argued that the improper classification and the failure to protect claims should be dismissed under the discretionary function exception to the FTCA.  The magistrate judge, upon referral of the motion to dismiss, found that the classification of an inmate is a discretionary function of the BOP and that Little had not shown that a "family tree" search must be conducted before classification; that the placement of inmates in the general population is a discretionary function of Hazelton staff; and that Little had not shown that mandatory directives were violated by staff or that a BOP employee made a discretionary judgment not grounded in the policy of the BOP.   The district court adopted the magistrate judge's report and recommendation and provided the following guidance:

> This Court and numerous other courts have held that a federal prisoner's
> claim under the FTCA for injuries caused by a fellow inmate are uniformly

held to be barred by the discretionary function exception. ***Donaldson v. United States***, 281 F.App'x 75, 76–78 (3d Cir. 2008) (upholding dismissal of FTCA claim that federal prison employees failed to protect plaintiff from assault by a fellow prisoner on a finding that the claim was barred by the discretionary function exception); ***Calderon***, 123 F.3d at 948–49 (same); ***Buchanan v. United States***, 915 F.2d 969 (5th Cir. 1990) (discretionary function exception applied to FTCA claim for damages by prisoners held hostage by other inmates during a prison uprising); ***Usry***, 2013 WL 1196650 at *8.

*Id*. at *7.

In ***Evans v. United States***, 2016 WL 4581339 (N.D. W.Va. Sept. 2, 2016) (Groh, C.J.), the plaintiff, Michael Shawn Evans ("Evans"), brought suit under the FTCA after another inmate stabbed him with screwdriver at FCI Gilmer in Glenville, West Virginia. Evans alleged that the prison was negligent in failing to protect him from his attacker. When the Government moved to dismiss, the Court found, first, that because "there is no federal statute, regulation or policy specifically prescribing a course of action for BOP employees to follow in regard to contraband weapons," the first prong of the discretionary function exception test (judgment/choice) was satisfied. Second, the court found that the second prong (public policy) was satisfied: "because the BOP is given discretion in exercising control over contraband shanks, it 'must be presumed' that its acts in this area are grounded in public policy." The court again noted that "courts have consistently found that prisoner suits alleging injury by other inmates are barred by the discretionary function

exception."   The Court found, as it did in *Little*, that the discretionary function exception applied and, therefore, that it lacked subject matter jurisdiction.  The Fourth Circuit affirmed the decision and denied a rehearing en banc. *Evans v. United States*, 671 F.App'x 186 (4th Cir. 2016).  The Supreme Court then denied a petition for writ of certiorari.  *Evans v. United States*, 138 S. Ct. 189 (2017).

In *Crawford v. United States*, 2019 WL 2366017 (N.D. W.Va. June 4, 2019) (Kleeh, J.), the plaintiff as Administratrix of her son's estate, filed an action under the FTCA seeking damages for her son's death on the theory that the BOP failed to maintain USP Hazelton in a reasonable safe manner, leading to her sons death.  On March 6, 2015, another inmate, the identity of whom is unknown to plaintiff, used a shiv to slice Mr. Crawford's throat and kill him.  Plaintiff alleges that the Government owed a duty of care to all inmates and that the duty included ensuring that contraband, such as a shiv, was not created or carried on the grounds by inmates.  As such, the Government breached its duty when it allowed another inmate to create and/or possess a shiv, which was then used to kill Mr. Crawford.

The Court found that  the correctional officers' conductt here was discretionary, and this finding was consistent with *Little*, *Evans*, and *Rich*. Because the conduct at issue here was discretionary, the Court has no subject matter jurisdiction over plaintiff's claims. *Crawford*, 2019 WL 2366017, at *7.

The BOP must provide for the protection, safekeeping, and care of inmates, but this does not guarantee a risk-free environment.  Decisions about how to safeguard prisoners are generally discretionary.  Judge Stamp, Judge Groh, and Judge Kleeh all found, at the

motion to dismiss level, that FTCA suits against the Government stemming from prisoner-on-prisoner violence are barred by the discretionary function exception. Notably, Judge Groh's decision in **Evans** came after the Fourth Circuit's decision in **Rich**.

This Court agrees with the above myriad of cases that an action based upon an alleged violation of a duty to separate or duty to protect are barred by the discretionary function exception to the FTCA.

Plaintiff seeks leave to conduct discovery on the issue. This Court will follow the lead of the Fourth Circuit in **Rich**, which denied discovery on the issue of separation, stating "[w]e also conclude that Rich is not entitled to discovery on this issue. Even accepting all of Rich's allegations regarding his history with the Aryan Brotherhood as true, the discretionary function exception still would apply to the decisions of the officials regarding prisoner placement, ultimately depriving us of jurisdiction. And because no facts that Rich could uncover in discovery would establish jurisdiction, we hold that the district court did not abuse its discretion in refusing Rich discovery regarding the officials' decision to not separate Rich from his attackers." **Rich v. United States**, 811 F.3d 140, 146 (4th Cir. 2015) (citing **Durden v. United States**, 736 F.3d at 307–08 (4th Cir. 2013)). *See also Crawford*, 2019 WL 2366017*, at *7 ("Exposing the Government to extensive rounds of discovery on the merits would undermine the discretionary function exception and introduce the very litigation pressures that Congress meant to avoid when it developed the exception. **Mitchell v. Forsyth**, 472 U.S. 511, 525–27 (1985)").

For the reasons stated above, the United States of America's Motion to Dismiss [**Doc. 48**] is **GRANTED**, the Individual Defendants' Motion to Dismiss Plaintiff's Claims

Against Them [**Doc. 49**] is **GRANTED**, and Defendants' Renewed Motion to Stay

Discovery [**Doc. 51**] is **DENIED AS MOOT**.  The above-styled case is **DISMISSED WITH**

**PREJUDICE** and the Clerk is ordered to **STRIKE** the case from the active docket of this

Court.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to any counsel of record herein.

**DATED**: January **12**, 2022.

**JOHN PRESTON BAILEY**
**UNITED STATES DISTRICT JUDGE**

36